# ATASCADERO STATE HOSPITAL ET AL. *v.* SCANLON

No. 84–351.   Argued March 25, 1985—Decided June 28, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 247. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 302. STEVENS, J., filed a dissenting opinion, *post*, p. 304.

*James E. Ryan,* Deputy Attorney General of California, argued the cause for petitioners. With him on the briefs were *John K. Van de Kamp,* Attorney General, *Thomas E. Warriner,* Assistant Attorney General, *Anne S. Pressman,* Supervising Deputy Attorney General, and *G. R. Overton,* Deputy Attorney General.

*Marilyn Holle* argued the cause for respondent. With her on the brief were *Joseph Lawrence, J. LeVonne Chambers, Eric Schnapper,* and *Stanley Fleishman.**

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether States and state agencies are subject to suit in federal court by litigants seeking retroactive monetary relief under § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794, or whether such suits are proscribed by the Eleventh Amendment.

---

**Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Cooper, Charles Fried, Christopher J. Wright,* and *Walter W. Barnett* filed a brief for the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *David L. Shapiro, Burt Neuborne, Charles S. Sims, Paul L. Hoffman,* and *Mark D. Rosenbaum;* for Senator Cranston et al. by *Bonnie Milstein;* and for the Disability and Employment Advocacy Project of the Employment Law Center by *Joan M. Graff* and *Robert Barnes.*

## I

Respondent, Douglas James Scanlon, suffers from diabetes mellitus and has no sight in one eye. In November 1979, he filed this action against petitioners, Atascadero State Hospital and the California Department of Mental Health, in the United States District Court for the Central District of California, alleging that in 1978 the hospital denied him employment as a graduate student assistant recreational therapist solely because of his physical handicaps. Respondent charged that the hospital's discriminatory refusal to hire him violated § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794, and certain state fair employment laws. Respondent sought compensatory, injunctive, and declaratory relief.

Petitioners moved for dismissal of the complaint on the ground that the Eleventh Amendment barred the federal court from entertaining respondent's claims. Alternatively, petitioners argued that in a suit for employment discrimination under § 504 of the Rehabilitation Act, a plaintiff must allege that the primary objective of the federal assistance received by the defendants is to provide employment, and that respondent's case should be dismissed because he did not so allege. In January 1980, the District Court granted petitioners' motion to dismiss the complaint on the ground that respondent's claims were barred by the Eleventh Amendment. On appeal, the United States Court of Appeals for the Ninth Circuit affirmed. *Scanlon* v. *Atascadero State Hospital*, 677 F. 2d 1271 (1982). It did not reach the question whether the Eleventh Amendment proscribed respondent's suit. Rather it affirmed the District Court on the ground that respondent failed to allege an essential element of a claim under § 504, namely, that a primary objective of the federal funds received by the defendants was to provide employment. *Id.*, at 1272.

Respondent then sought review by this Court. We granted certiorari, 465 U. S. 1095 (1984), vacated the judg-

ment of the Court of Appeals, and remanded the case for further consideration in light of *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624 (1984), in which we held that § 504's bar on employment discrimination is not limited to programs that receive federal aid for the primary purpose of providing employment. *Id.*, at 632–633. On remand, the Court of Appeals reversed the judgment of the District Court. It held that "the Eleventh Amendment does not bar [respondent's] action because the State, if it has participated in and received funds from programs under the Rehabilitation Act, has implicitly consented to be sued as a recipient under 29 U. S. C. § 794." 735 F. 2d 359, 362 (1984). Although noting that the Rehabilitation Act did not expressly abrogate the States' Eleventh Amendment immunity, the court reasoned that a State's consent to suit in federal court could be inferred from its participation in programs funded by the Act. The court based its view on the fact that the Act provided remedies, procedures, and rights against "any recipient of Federal assistance" while implementing regulations expressly defined the class of recipients to include the States. Quoting our decision in *Edelman* v. *Jordan*, 415 U. S. 651, 672 (1974), the court determined that the "'threshold fact of congressional authorization to sue a class of defendants which literally includes [the] States'" was present in this case. 735 F. 2d, at 361.

The court's decision in this case is in conflict with those of the Courts of Appeals for the First and Eighth Circuits. See *Ciampa* v. *Massachusetts Rehabilitation Comm'n*, 718 F. 2d 1 (CA1 1983); *Miener* v. *Missouri*, 673 F. 2d 969 (CA8), cert. denied, 459 U. S. 909 (1982). We granted certiorari to resolve this conflict, 469 U. S. 1032 (1984), and we now reverse.

II

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

or Subjects of any Foreign State." As we have recognized, the significance of this Amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III" of the Constitution. *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98 (1984) *(Pennhurst II)*. Thus, in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), the Court held that the Amendment barred a citizen from bringing a suit against his own State in federal court, even though the express terms of the Amendment do not so provide.

There are, however, certain well-established exceptions to the reach of the Eleventh Amendment. For example, if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action. See, *e. g.*, *Clark* v. *Barnard*, 108 U. S. 436, 447 (1883).[1] Moreover, the Eleventh Amendment is "necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment," that is, by Congress' power "to enforce, by appropriate legislation, the substantive provisions of the Fourteenth Amendment." *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976). As a result, when acting pursuant to § 5 of the Fourteenth Amendment, Congress can abrogate the Eleventh Amendment without the States' consent. *Ibid.*

But because the Eleventh Amendment implicates the fundamental constitutional balance between the Federal Government and the States,[2] this Court consistently has held

---

[1] A State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program. In each of these situations, we require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment. As we said in *Edelman* v. *Jordan*, 415 U. S. 651, 673 (1974), "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here."

[2] JUSTICE BRENNAN's dissent repeatedly asserts that established Eleventh Amendment doctrine is not "grounded on principles essential to the structure of our federal system or necessary to protect the cherished con-

that these exceptions apply only when certain specific conditions are met. Thus, we have held that a State will be deemed to have waived its immunity "only where stated 'by

stitutional liberties of our people . . . ." *Post,* at 247–248; see also *post,* at 258, 302. We believe, however, that our Eleventh Amendment doctrine is necessary to support the view of the federal system held by the Framers of the Constitution. See n. 3, *infra.* The Framers believed that the States played a vital role in our system and that strong state governments were essential to serve as a "counterpoise" to the power of the Federal Government. See, *e. g.,* The Federalist No. 17, p. 107 (J. Cooke ed. 1961); The Federalist No. 46, p. 316 (J. Cooke ed. 1961). The "new evidence," discovered by the dissent in The Federalist and in the records of the state ratifying conventions, has been available to historians and Justices of this Court for almost two centuries. Viewed in isolation, some of it is subject to varying interpretations. But none of the Framers questioned that the Constitution created a federal system with some authority expressly granted the Federal Government and the remainder retained by the several States. See, *e. g.,* The Federalist Nos. 39, 45. The Constitution never would have been ratified if the States and their courts were to be stripped of their sovereign authority except as expressly provided by the Constitution itself.

The principle that the jurisdiction of the federal courts is limited by the sovereign immunity of the States "is, without question, a reflection of concern for the sovereignty of the States . . . ." *Employees* v. *Missouri Dept. of Public Health and Welfare,* 411 U. S. 279, 293 (1973) (MARSHALL, J., concurring in result). As the Court explained almost 65 years ago:

"That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against the State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification." *Ex parte New York,* 256 U. S. 490, 497 (1921) (citations omitted).

See also cases cited in n. 3, *infra.*

JUSTICE BRENNAN's dissent also argues that in the absence of jurisdiction in the federal courts, the States are "exemp[t] . . . from compliance

the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Edelman* v. *Jordan*, 415 U. S., at 673, quoting *Murray* v. *Wilson Distilling Co.*, 213 U. S. 151, 171 (1909). Likewise, in determining whether Congress in exercising its Fourteenth Amendment powers has abrogated the States' Eleventh Amendment immunity, we have required "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst II*, 465 U. S., at 99, quoting *Quern* v. *Jordan*, 440 U. S. 332, 342 (1979). Accord, *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973).

In this case, we are asked to decide whether the State of California is subject to suit in federal court for alleged violations of § 504 of the Rehabilitation Act. Respondent makes three arguments in support of his view that the Eleventh Amendment does not bar such a suit: first, that the State has waived its immunity by virtue of Art. III, § 5, of the California Constitution; second, that in enacting the Rehabilitation Act, Congress has abrogated the constitutional immunity of the States; third, that by accepting federal funds under the Rehabilitation Act, the State has consented to suit in federal court. Under the prior decisions of this Court, none of these claims has merit.

---

with laws that bind every other legal actor in our Nation." *Post*, at 248. This claim wholly misconceives our federal system. As JUSTICE MARSHALL has noted, "the issue is not the general immunity of the States from private suit . . . but merely the susceptibility of the States to suit before *federal tribunals." Employees* v. *Missouri Dept. of Public Health and Welfare, supra*, at 293–294 (concurring in result) (emphasis added). It denigrates the judges who serve on the state courts to suggest that they will not enforce the supreme law of the land. See *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 341–344 (1816). See also *Stone* v. *Powell*, 428 U. S. 465, 493, n. 35 (1976), and *post*, at 256, n. 8.

## III

Respondent argues that the State of California has waived its immunity to suit in federal court, and thus the Eleventh Amendment does not bar this suit. See *Clark* v. *Barnard*, 108 U. S. 436 (1883). Respondent relies on Art. III, §5, of the California Constitution, which provides: "Suits may be brought against the State in such manner and in such courts as shall be directed by law." In respondent's view, unless the California Legislature affirmatively imposes sovereign immunity, the State is potentially subject to suit in any court, federal as well as state.

The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment. *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 150 (1981) *(per curiam)*. As we explained just last Term, "a State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst II, supra,* at 99. Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.* See *Smith* v. *Reeves*, 178 U. S. 436, 441 (1900); *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47, 54 (1944). In view of these principles, we do not believe that Art. III, §5, of the California Constitution constitutes a waiver of the State's constitutional immunity. This provision does not specifically indicate the State's willingness to be sued in federal court. Indeed, the provision appears simply to authorize the legislature to waive the State's sovereign immunity. In the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction, we decline to find that California has waived its constitutional immunity.

## IV

Respondent also contends that in enacting the Rehabilitation Act, Congress abrogated the States' constitutional immunity. In making this argument, respondent relies on the pre- and post-enactment legislative history of the Act and inferences from general statutory language. To reach respondent's conclusion, we would have to temper the requirement, well established in our cases, that Congress unequivocally express its intention to abrogate the Eleventh Amendment bar to suits against the States in federal court. *Pennhurst II, supra,* at 99; *Quern* v. *Jordan, supra,* at 342–345. We decline to do so, and affirm that Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute. The fundamental nature of the interests implicated by the Eleventh Amendment dictates this conclusion.

Only recently the Court reiterated that "the States occupy a special and specific position in our constitutional system . . . ." *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 547 (1985). The "constitutionally mandated balance of power" between the States and the Federal Government was adopted by the Framers to ensure the protection of "our fundamental liberties." *Id.,* at 572 (POWELL, J., dissenting). By guaranteeing the sovereign immunity of the States against suit in federal court, the Eleventh Amendment serves to maintain this balance. "Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system." *Pennhurst II, supra,* at 99.

Congress' power to abrogate a State's immunity means that in certain circumstances the usual constitutional balance between the States and the Federal Government does not obtain. "Congress may, in determining what is 'appropri-

ate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Fitzpatrick*, 427 U. S., at 456. In view of this fact, it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment. The requirement that Congress unequivocally express this intention in the statutory language ensures such certainty.

It is also significant that in determining whether Congress has abrogated the States' Eleventh Amendment immunity, the courts themselves must decide whether their own jurisdiction has been expanded. Although it is of course the duty of this Court "to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), it is appropriate that we rely only on the clearest indications in holding that Congress has enhanced our power. See *American Fire & Cas. Co.* v. *Finn*, 341 U. S. 6, 17 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation . . .").

For these reasons, we hold—consistent with *Quern*, *Edelman*, and *Pennhurst II*—that Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself.[3]

---

[3] In a remarkable view of *stare decisis*, JUSTICE BRENNAN's dissent states that our decision today evinces a "lack of respect for precedent." *Post*, at 258. Not a single authority is cited for this claim. In fact, adoption of the dissent's position would require us to overrule numerous decisions of this Court. However one may view the merits of the dissent's historical argument, the principle of *Hans* v. *Louisiana*, 134 U. S. 1 (1890), that "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III," *Pennhurst II*, 465 U. S., at 98, has been affirmed time and time again, up to the present day. *E. g.*, *North Carolina* v. *Temple*, 134 U. S. 22, 30 (1890); *Fitts* v. *McGhee*, 172 U. S. 516, 524 (1899); *Bell* v. *Mississippi*, 177 U. S. 693 (1900); *Smith* v. *Reeves*, 178

In light of this principle, we must determine whether Congress, in adopting the Rehabilitation Act, has chosen to override the Eleventh Amendment.[4] Section 504 of the Rehabilitation Act provides in pertinent part:

U. S. 436, 446 (1900); *Palmer* v. *Ohio,* 248 U. S. 32, 34 (1918); *Duhne* v. *New Jersey,* 251 U. S. 311, 313 (1920); *Ex parte New York,* 256 U. S., at 497; *Missouri* v. *Fiske,* 290 U. S. 18, 26 (1933); *Great Northern Life Insurance Co.* v. *Read,* 322 U. S. 47, 51 (1944); *Ford Motor Co.* v. *Department of Treasury of Indiana,* 323 U. S. 459, 464 (1945); *Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 304, n. 13 (1952); *Parden* v. *Terminal Railway of Ala. Docks Dept.,* 377 U. S. 184, 186 (1964); *United States* v. *Mississippi,* 380 U. S. 128, 140 (1965); *Employees* v. *Missouri Public Health and Welfare Dept.,* 411 U. S., at 280; *Edelman* v. *Jordan,* 415 U. S., at 662–663; *Pennhurst II, supra.* JUSTICE BRENNAN long has maintained that the settled view of *Hans* v. *Louisiana,* as established in the holdings and reasoning of the above cited cases, is wrong. See, *e. g., County of Oneida* v. *Oneida Indian Nation,* 470 U. S. 226, 254 (1985) (BRENNAN, J., dissenting in part); *Pennhurst II, supra,* at 125 (BRENNAN, J., dissenting); *Employees* v. *Missouri Dept. of Public Health and Welfare, supra,* at 298 (BRENNAN, J., dissenting); *Edelman* v. *Jordan,* 415 U. S., at 687 (BRENNAN, J., dissenting). It is a view, of course, that he is entitled to hold. But the Court has never accepted it, and we see no reason to make a further response to the scholarly, 55-page elaboration of it today.

In a dissent expressing his willingness to overrule *Edelman* v. *Jordan, supra,* as well as at least 16 other Supreme Court decisions that have followed *Hans* v. *Louisiana,* see *supra,* JUSTICE STEVENS would "further unrave[l] the doctrine of *stare decisis," Florida Dept. of Health* v. *Florida Nursing Home Assn.,* 450 U. S. 147, 155 (1981), because he views the Court's decision in *Pennhurst II* as "repudiat[ing] at least 28 cases." *Post,* at 304, citing *Pennhurst II, supra,* at 165–166, n. 50 (STEVENS, J., dissenting). We previously have addressed at length his allegation that the decision in *Pennhurst II* overruled precedents of this Court, and decline to do so again here. See *Pennhurst II, supra,* at 109–111, nn. 19, 20, and 21. JUSTICE STEVENS would ignore *stare decisis* in this case because in the view of a minority of the Court two prior decisions of the Court ignored it. This reasoning would indeed "unravel" a doctrine upon which the rule of law depends.

[4] Petitioners assert that the Rehabilitation Act of 1973 does not represent an exercise of Congress' Fourteenth Amendment authority, but was

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 87 Stat. 394, as amended and as set forth in 29 U. S. C. § 794.

Section 505, which was added to the Act in 1978, as set forth in 29 U. S. C. § 794a, describes the available remedies under the Act, including the provisions pertinent to this case:

"(a)(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U. S. C. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

"(b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The statute thus provides remedies for violations of § 504 by "*any* recipient of Federal assistance." There is no claim here that the State of California is not a recipient of federal

---

enacted pursuant to the Spending Clause, Art. I, § 8, cl. 1. Petitioners conceded below, however, that the Rehabilitation Act was passed pursuant to § 5 of the Fourteenth Amendment. Thus, we first analyze § 504 in light of Congress' power under the Fourteenth Amendment to subject unconsenting States to federal court jurisdiction. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976). In Part V, *infra*, at 246, we address the reasoning of the Court of Appeals and conclude that by accepting funds under the Act, the State did not "implicitly consen[t] to be sued . . . ." 735 F. 2d 359, 362 (1984).

aid under the statute. But given their constitutional role, the States are not like any other class of recipients of federal aid. A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically. *Pennhurst II*, 465 U. S., at 99, citing *Quern* v. *Jordan*, 440 U. S. 332 (1979). Accordingly, we hold that the Rehabilitation Act does not abrogate the Eleventh Amendment bar to suits against the States.

## V

Finally, we consider the position adopted by the Court of Appeals that the State consented to suit in federal court by accepting funds under the Rehabilitation Act.[5] 735 F. 2d, at 361–362. In reaching this conclusion, the Court of Appeals relied on "the extensive provisions [of the Act] under which the states are the express intended recipients of federal assistance." *Id.*, at 360. It reasoned that "this is a case in which a 'congressional enactment . . . by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included States or state instrumentalities,' and 'the State by its participation in the program authorized by Congress had in effect consented to the abrogation of that immunity,'" *id.*, at 361, citing *Edelman* v. *Jordan*, 415 U. S., at 672. The Court of Appeals thus concluded that if the State "has participated in and received funds from programs under the Rehabilitation Act, [it] has implicitly consented to be sued as a recipient under 29 U. S. C. § 794." 735 F. 2d, at 362.

The court properly recognized that the mere receipt of federal funds cannot establish that a State has consented to suit

---

[5] Although the Court of Appeals seemed to state that the Rehabilitation Act was adopted pursuant to § 5 of the Fourteenth Amendment, by focusing on whether the State consented to federal jurisdiction it engaged in analysis relevant to Spending Clause enactments.

in federal court. *Ibid.*, citing *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S., at 150; *Edelman* v. *Jordan, supra,* at 673. The court erred, however, in concluding that because various provisions of the Rehabilitation Act are addressed to the States, a State necessarily consents to suit in federal court by participating in programs funded under the statute. We have decided today that the Rehabilitation Act does not evince an unmistakable congressional purpose, pursuant to § 5 of the Fourteenth Amendment, to subject unconsenting States to the jurisdiction of the federal courts. The Act likewise falls far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity. Thus, were we to view this statute as an enactment pursuant to the Spending Clause, Art. I, § 8, see n. 4, *supra,* we would hold that there was no indication that the State of California consented to federal jurisdiction.

## VI

The provisions of the Rehabilitation Act fall far short of expressing an unequivocal congressional intent to abrogate the States' Eleventh Amendment immunity. Nor has the State of California specifically waived its immunity to suit in federal court. In view of these determinations, the judgment of the Court of Appeals must be reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

If the Court's Eleventh Amendment doctrine were grounded on principles essential to the structure of our federal system or necessary to protect the cherished constitutional liberties of our people, the doctrine might be unobjectionable; the interpretation of the text of the Constitution in light of changed circumstances and unforeseen events—and with full regard for the purposes underlying the text—has always been the unique role of this Court. But the Court's

Eleventh Amendment doctrine diverges from text and history virtually without regard to underlying purposes or genuinely fundamental interests. In consequence, the Court has put the federal judiciary in the unseemly position of exempting the States from compliance with laws that bind every other legal actor in our Nation. Because I believe that the doctrine rests on flawed premises, misguided history, and an untenable vision of the needs of the federal system it purports to protect, I believe that the Court should take advantage of the opportunity provided by this case to reexamine the doctrine's historical and jurisprudential foundations. Such an inquiry would reveal that the Court, in Professor Shapiro's words, has taken a wrong turn.[1] Because the Court today follows this mistaken path, I respectfully dissent.

I

I first address the Court's holding that Congress did not succeed in abrogating the States' sovereign immunity when it enacted § 504 of the Rehabilitation Act, 29 U. S. C. § 794. If this holding resulted from the Court's examination of the statute and its legislative history to determine whether Congress intended in § 504 to impose an obligation on the States enforceable in federal court, I would confine my dissent to the indisputable evidence to the contrary in the language and history of § 504.

Section 504 imposes an obligation not to discriminate against the handicapped in "any program or activity receiving Federal financial assistance." This language is general and unqualified, and contains no indication whatsoever that an exemption for the States was intended. Moreover, state governmental programs and activities are undoubtedly the recipients of a large percentage of federal funds.[2] Given this

---

[1] See Shapiro, Wrong Turns: The Eleventh Amendment and the *Pennhurst* Case, 98 Harv. L. Rev. 61 (1984).

[2] For instance, in 1972–1973, the year in which Congress was considering § 504, state governments received over $31 billion in revenue from the

widespread state dependence on federal funds, it is quite incredible to assume that Congress did not intend that the States should be fully subject to the strictures of § 504.

The legislative history confirms that the States were among the primary targets of § 504. In introducing the predecessor of § 504 as an amendment to Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d, Representative Vanik clearly indicated that governments would be among the primary targets of the legislation: "Our Governments tax [handicapped] people, their parents and relatives, but fail to provide services for them. . . . The opportunities provided by the Government almost always exclude the handicapped." 117 Cong. Rec. 45974 (1971). He further referred approvingly to a federal-court suit against the State of Pennsylvania raising the issue of educational opportunities for the handicapped. See *id.*, at 45974–45975 (citing *Pennsylvania Assn. for Retarded Children* v. *Pennsylvania*, 343 F. Supp. 279 (ED Pa 1972), and characterizing it as a "suit against the State"). Two months later, Representative Vanik noted the range of state actions that could disadvantage the handicapped. He said that state governments "lack funds and facilities" for medical care for handicapped children and "favor the higher income families" in tuition funding. 118 Cong. Rec. 4341 (1972). He pointed out that "the States are unable to define and deal with" the illnesses of the handicapped child, and that "[e]xclusion of handicapped children [from public schools] is illegal in some States, but the States plead lack of funds." *Ibid.* Similarly, Senator Humphrey, the bill's sponsor in the Senate, focused particularly on a suit against a state-operated institution for the mentally retarded as demonstrating the need for the bill. See *id.*, at 9495, 9502.

The language used in the statute ("any program or activity receiving Federal financial assistance") has long been used

---

Federal Government. By 1981–1982, this had grown to $66 billion. Bureau of the Census, Historical Statistics on Governmental Finances and Employment 34 (1982).

to impose obligations on the States under other statutory schemes. For example, Title VI, enacted in 1964, bans discrimination on the basis of race, color, or national origin by "any program or activity receiving Federal financial assistance." 42 U. S. C. § 2000d. Soon after its enactment, seven agencies promulgated regulations that defined a recipient of federal financial assistance to include "any State, political subdivision of any State or instrumentality of any State or political subdivision." See, e. g., 29 Fed. Reg. 16274, § 15.2(e) (1964). See generally *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 463 U. S. 582, 618 (1983) (MARSHALL, J., dissenting). Over 40 federal agencies and every Cabinet Department adopted similar regulations. *Id.*, at 619. As Senator Javits remarked in the debate on Title VI, "[w]e are primarily trying to reach units of government, not individuals." 110 Cong. Rec. 13700 (1964).

Similarly Title IX of the Education Amendments of 1972, 20 U. S. C. § 1681(a), prohibits discrimination on the basis of sex by "any education program or activity receiving Federal financial assistance." The regulations governing Title IX use the same definition of "recipient"—which explicitly includes the States—as do the Title VI regulations. See 34 CFR § 106.2(h) (1985). The Congress that enacted § 504 had the examples of Titles VI and IX before it, and plainly knew that the language of the statute would include the States.[3]

---

[3] The Rehabilitation Act was amended in 1974, a year after its original enactment. Pub. L. 93–516, 88 Stat. 1617. The Senate Report that accompanied the amendment acknowledged that "Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, . . . and section 901 of the Education Amendments of 1974 *[sic]*." S. Rep. No. 93–1297, pp. 39–40 (1974). These amendments and their history "clarified the scope of § 504" and "shed significant light on the intent with which § 504 was enacted." *Alexander* v. *Choate*, 469 U. S. 287, 306–307, n. 27 (1985).

Implementing regulations promulgated for § 504 included the same definition of "recipient" that had previously been used to implement Title VI and Title IX. See 45 CFR § 84.3(f) (1984). In 1977, Congress held hearings on the implementation of § 504, and subsequently produced amendments to the statute enacted in 1978. Pub. L. 95–602, 92 Stat. 2982, § 505(a)(2), 29 U. S. C. § 794a. The Senate Report accompanying the amendments explicitly approved the implementing regulations. S. Rep. No. 95–890, p. 19 (1981). No Member of Congress questioned the reach of the regulations. In describing another section of the 1978 amendments which brought the Federal Government within the reach of § 504, Representative Jeffords noted that the section "applies 504 to the Federal Government as well as State and local recipients of Federal dollars." 124 Cong. Rec. 13901 (1978).[4] Representative Sarasin emphasized that "[n]o one should discriminate against an individual because he or she suffers from a handicap—not private employers, not State and local governments, and most certainly, not the Federal Government." *Id.*, at 38552.

The 1978 amendments also addressed the remedies for violations of § 504:

> "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U. S. C. 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U. S. C. § 794a(a)(2).

Again, the amendment referred in general and unqualified terms to "any recipient of Federal assistance." An addi-

---

[4] Representative Jeffords also noted that "it did not seem right to me that the Federal Government should require States and localities to eliminate discrimination against the handicapped wherever it exists and remain exempt themselves." 124 Cong. Rec. 38551 (1978).

tional provision of the 1978 amendments made available attorney's fees to prevailing parties in actions brought to enforce § 504. Discussing these two provisions, Senator Cranston presupposed that States would be subject to suit under this section:

> "[W]ith respect to State and local bodies or State and local officials, attorney's fees, similar to other items of cost, would be collected from the official, in his official capacity from funds of his or her agency or under his or her control; or from the State or local government— regardless of whether such agency or Government is a named party." 124 Cong. Rec. 30347 (1978)

Given the unequivocal legislative history, the Court's conclusion that Congress did not abrogate the States' sovereign immunity when it enacted § 504 obviously cannot rest on an analysis of what Congress intended to do or on what Congress thought it was doing. Congress intended to impose a legal obligation on the States not to discriminate against the handicapped. In addition, Congress fully intended that whatever remedies were available against *other* entities— including the Federal Government itself after the 1978 amendments—be equally available against the States. There is simply not a shred of evidence to the contrary.

## II

Rather than an interpretation of the intent of Congress, the Court's decision rests on the Court's current doctrine of Eleventh Amendment sovereign immunity, which holds that "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III" of the Constitution. *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98 (1984). Despite the presence of the most clearly lawless behavior by the state government, the Court's doctrine holds that the judicial authority of the United States

does not extend to suits by an individual against a State in federal court.

The Court acknowledges that the supposed lack of judicial power may be remedied, either by the State's consent,[5] or by express congressional abrogation pursuant to the Civil War Amendments, see *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976); *City of Rome* v. *United States*, 446 U. S. 156 (1980), or perhaps pursuant to other congressional powers. But the Court has raised formidable obstacles to congressional efforts to abrogate the States' immunity; the Court has put in place a series of special rules of statutory draftsmanship that Congress

---

[5] The "stringent," see *ante,* at 241, test that the Court applies to purported state waivers of sovereign immunity is a mirror image of the test it applies to congressional abrogation of state sovereign immunity. Just as the Court today decides that Congress, if it desires effectively to abrogate a State's sovereign immunity, must do so expressly in the statutory language, so the Court similarly decides that a State's waiver, to be effective, must be "specifically applicable to federal-court jurisdiction." *Ibid.* In the Court's words, "[a]lthough a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment." *Ibid.* Ordinarily, a federal court is expected faithfully to decide state-law questions before it as the courts of a State would. I would think that a federal court deciding the scope of a state waiver of sovereign immunity should attempt to construe the state law of sovereign immunity as a state court would, making use of relevant legislative history and legal precedents. Yet, despite the absence of any identifiable federal interest that would justify a departure from state law, the Court eschews any effort to construe California's constitutional waiver requirement in accordance with California law. See, *e. g., Muskopf* v. *Corning Hospital Dist.,* 55 Cal. 2d 211, 216, 359 P. 2d 457, 460 (1961) (abrogating state sovereign immunity for all tort cases and holding it to be an "anachronism, without rational basis, and exist[ing] only by the force of inertia"). *Id.,* at 216, 359 P. 2d, at 460. Instead, the Court seems to believe that the Eleventh Amendment justifies the Court in imposing on the state legislatures, as well as Congress, special rules of statutory draftsmanship if they would make a waiver of state sovereign immunity in federal court successful. Apparently, even States that want to make a federal forum available for the fair adjudication of grievances arising under federal law ought to be deterred from doing so.

must obey before the Court will accord recognition to its act. *Employees* v. *Missouri Dept. of Public Health and Welfare,* 411 U. S. 279 (1973), held that Congress must make its intention "clear" if it sought to lift the States' sovereign immunity conditional on their participation in a federal program. *Id.,* at 285. *Edelman* v. *Jordan,* 415 U. S. 651 (1974), made it still more difficult for Congress to act, stating that "we will find waiver only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Id.,* at 673. *Pennhurst State School and Hospital* v. *Halderman, supra,* required "an unequivocal expression of congressional intent." *Id.,* at 99. Finally, the Court today tightens the noose by requiring "that Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language *in the statute itself." Ante,* at 243 (emphasis added).

These special rules of statutory drafting are not justified (nor are they justifiable) as efforts to determine the genuine intent of Congress; no reason has been advanced why ordinary canons of statutory construction would be inadequate to ascertain the intent of Congress. Rather, the special rules are designed as hurdles to keep the disfavored suits out of the federal courts. In the Court's words, the test flows from the need to maintain "the usual constitutional balance between the States and the Federal Government." *Ante,* at 242.[6] The doctrine is thus based on a fundamental policy decision, vaguely attributed to the Framers of Article III or the Eleventh Amendment, that the federal courts ought not to hear suits brought by individuals against States. This Court executes the policy by making it difficult, but not impossible,

---

[6] See also *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 99 (1984) ("Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system").

for Congress to create private rights of action against the States.[7]

Reliance on this supposed constitutional policy reverses the ordinary role of the federal courts in federal-question cases. Federal courts are instruments of the National Government, seeing to it that constitutional limitations are obeyed while interpreting the will of Congress in enforcing the federal laws. In the Eleventh Amendment context, however, the Court instead relies on a supposed constitutional policy disfavoring suits against States as justification for ignoring the will of Congress; the goal seems to be to obstruct the ability of Congress to achieve ends that are otherwise constitutionally unexceptionable and well within the reach of its Article I powers.

The Court's sovereign immunity doctrine has other unfortunate results. Because the doctrine is inconsistent with the

---

[7] In this case, the Court's decision relentlessly to apply its "clear-statement rule" demonstrates how that rule serves no purpose other than obstructing the will of Congress. When Congress enacted § 504, it could have had no idea that it must obey the extreme clear-statement rule adopted by the Court for the first time today. The roots of that rule are found in *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973), which was decided on April 18, 1973. Cf. *Parden* v. *Terminal Railway of Ala. Docks Dept.*, 377 U. S. 184 (1964). The *Employees* case, of course, did not itself lay down the extreme rule adopted today. In any event, the bill which became § 504 had been first enacted six months previously. See 118 Cong. Rec. 35841 (Oct. 13, 1972) (enactment of bill by Senate); *id.*, at 36409 (Oct. 14, 1972) (enactment of bill by House). It was then vetoed by the President and reenacted in February 1973. See 119 Cong. Rec. 5901 (Feb. 28, 1973) (Senate); *id.*, at 7139 (Mar. 8, 1973) (House). Another veto followed, and the legislation was finally signed into law on September 26, 1973. See *id.*, at 29633 (Sept. 13, 1973) (Senate enactment of final bill); *id.*, at 30151 (Sept. 18, 1973) (House enactment of final bill). Given this chronology, for the Court now to hold that Congress did not abrogate the States' immunity because it did not "unequivocally express this intention in the statutory language" is to change the rules for lawmaking after Congress has already acted. Congress, like other officials, "cannot be expected to predict the future course of constitutional law." *Procunier* v. *Navarette*, 434 U. S. 555, 562 (1978).

essential function of the federal courts — to provide a fair and impartial forum for the uniform interpretation and enforcement of the supreme law of the land — it has led to the development of a complex body of technical rules made necessary by the need to circumvent the intolerable constriction of federal jurisdiction that would otherwise occur. Under the rule of *Ex parte Young*, 209 U. S. 123 (1908), a State may be required to obey federal law, so long as the plaintiff remembers to name a state official rather than the State itself as defendant, see *Alabama* v. *Pugh*, 438 U. S. 781 (1978), and so long as the relief sought is prospective rather than retrospective. *Edelman* v. *Jordan*, 415 U. S. 651 (1974).[8] These intricate rules often create manifest injustices while failing to respond to any legitimate needs of the States. A damages award may often be the only practical remedy available to the plaintiff,[9] and the threat of a damages award may be the only effec-

---

[8] There are other rules created specifically to permit suits that would appear to be barred by any thoroughgoing interpretation of the Eleventh Amendment as a bar to exercise of the federal judicial power in suits against States. For instance, *Lincoln County* v. *Luning*, 133 U. S. 529, 530 (1890), established that the Eleventh Amendment is not a bar to suits against local governmental units. In addition, it seems to have been a longstanding, though unarticulated, rule that the Eleventh Amendment does not limit exercise of otherwise proper federal *appellate* jurisdiction over suits from state courts. For instance, in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), we adjudicated a taxpayer's appeal from an unfavorable judgment in a suit against state officials for refund of taxes. Cf. *Edelman* v. *Jordan*. Compare *Martinez* v. *California*, 444 U. S. 277 (1980) (adjudicating appeal of § 1983 action brought against State in state court) with *Quern* v. *Jordan*, 440 U. S. 332 (1979) (holding that § 1983 does not abrogate state sovereign immunity in federal court). See also *Williams* v. *Vermont*, 472 U. S. 14 (1985); *Summa Corp.* v. *California ex rel State Lands Comm'n*, 466 U. S. 198 (1984); *Aloha Airlines, Inc.* v. *Director of Taxation of Hawaii*, 464 U. S. 7 (1983); *Thomas* v. *Review Board of Ind. Employment Security Div.*, 450 U. S. 707 (1981); *Bonelli Cattle Co.* v. *Arizona*, 414 U. S. 313 (1973).

[9] In this case, for instance, damages may well be the only practical relief available for respondent. He originally brought suit in 1979 alleging that the State had improperly denied him employment as a graduate stu-

tive deterrent to a defendant's willful violation of federal law. Cf. *id.*, at 691–692 (MARSHALL, J., dissenting). While the prohibition of damages awards thus imposes substantial costs on plaintiffs and on members of a class Congress sought to protect, the injunctive relief that s permitted can often be more intrusive—and more expensive—than a simple damages award would be.[10]

The Court's doctrine itself has been unstable. As I shall discuss below, the doctrine lacks a textual anchor, a firm historical foundation, or a clear rationale. As a result, it has been impossible to determine to what extent the principle of state accountability to the rule of law can or should be accommodated within the competing framework of state nonaccountability put into place by the Court's sovereign immunity doctrine. For this reason, we have been unable to agree on the content of the special "rules" we have applied to Acts of Congress to determine whether they abrogate state sovereign immunity. Compare *Parden* v. *Terminal Railway of Ala. Docks Dept.*, 377 U. S. 184 (1964), with *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S. 279 (1973). Whatever rule is decided upon at a given time is then applied *retroactively* to actions taken by Congress. See n. 7, *supra.* Finally, in the absence of any plau-

---

dent assistant recreational therapist. Even if he had brought suit against state officials as well as the State itself, it is reasonable to suppose that now—six years later—he has attained his degree and would obtain no benefit from an injunction ordering the end of discrimination against the handicapped in hiring graduate student assistants. "For people in [Scanlon's] shoes, it is damages or nothing." *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 410 (1971).

[10] Congress, of course, may decide in a given case that a remedial scheme should be limited to either damages or injunctive relief. Cf. 42 U. S. C. § 2000a–3(a) (statute limiting remedy to "preventive" relief against *all* defendants). Our role in such a case is to interpret the will of Congress with respect to the scope of the permissible relief. In the Eleventh Amendment context, however, the Court seems to have decided that the supposed constitutional policy disfavoring suits against States justifies limiting the scope of relief regardless of the apparent will of Congress.

258

sible limiting principles, the Court has overruled and ignored past cases that seemed to stand in the way of vindication of the doubtful States' right the Court has created. See *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S., at 165–166, n. 50.

I might tolerate all of these results—the unprecedented intrusion on Congress' lawmaking power and consequent increase in the power of the courts, the development of a complex set of rules to circumvent the obviously untenable results that would otherwise ensue, the lack of respect for precedent and the lessons of the past evident in *Pennhurst*—if the Court's sovereign immunity doctrine derived from essential constitutional values protecting the freedom of our people or the structure of our federal system. But that is sadly not the case. Instead, the paradoxical effect of the Court's doctrine is to require the federal courts to protect States that violate federal law from the legal consequences of their conduct.

### III

Since the Court began over a decade ago aggressively to expand its doctrine of Eleventh Amendment sovereign immunity, see *Employees* v. *Missouri Dept. of Public Health and Welfare, supra,* modern scholars and legal historians have taken a critical look at the historical record that is said to support the Court's result.[11] Recent research has discov-

---

[11] See, *e. g.,* Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan. L. Rev. 1033 (1983) (hereinafter Fletcher); Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889 (1983) (hereinafter Gibbons); C. Jacobs, The Eleventh Amendment and Sovereign Immunity (1972) (hereinafter Jacobs); Field, The Eleventh Amendment and Other Sovereign Immunity Doctrines, 126 U. Pa. L. Rev. 515, 1203 (1978) (hereinafter Field); Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum. L. Rev. 1413 (1975); Orth, The Interpretation of the Eleventh Amendment,

ered and collated substantial evidence that the Court's constitutional doctrine of state sovereign immunity has rested on a mistaken historical premise. The flawed underpinning is the premise that either the Constitution or the Eleventh Amendment embodied a principle of state sovereign immunity as a limit on the federal judicial power. New evidence concerning the drafting and ratification of the original Constitution indicates that the Framers never intended to constitutionalize the doctrine of state sovereign immunity. Consequently, the Eleventh Amendment could not have been, as the Court has occasionally suggested, an effort to reestablish a limitation on the federal judicial power granted in Article III. Nor, given the limited terms in which it was written, could the Amendment's narrow and technical language be understood to have instituted a sweeping new limitation on the federal judicial power whenever an individual attempts to sue a State. A close examination of the historical records reveals a rather different status for the doctrine of state sovereign immunity in federal court. There simply is no constitutional principle of state sovereign immunity, and no constitutionally mandated policy of excluding suits against States from federal court.

A

In *Hans* v. *Louisiana*, 134 U. S. 1 (1890), the Court stated that to permit a citizen to bring a suit against a State in federal court would be "an attempt to strain the Constitution and the law to a construction never imagined or dreamed of." *Id.*, at 15. The text of the Constitution, of course, contains no explicit adoption of a principle of state sovereign immunity. The passage from *Hans* thus implies that everyone involved in the framing or ratification of the Constitution be-

1798–1908: A Case Study of Judicial Power, 1983 U. Ill. L. Rev. 423; Shapiro, Wrong Turns: The Eleventh Amendment and the *Pennhurst* Case, 98 Harv. L. Rev. 61 (1984); Engdahl, Immunity and Accountability for Positive Governmental Wrongs, 44 U. Colo. L. Rev. 1 (1972).

lieved that Article III included a tacit prohibition on the exercise of the judicial power when a State was being sued in federal court. The early history of the Constitution reveals, however, that the Court in *Hans* was mistaken. The unamended Article III was often read to the contrary to prohibit not the exercise of the judicial power, but the assertion of state sovereign immunity as a defense, even in cases arising solely under state law.

It is useful to begin with the text of Article III. Section 2 provides:

> "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

The judicial power of the federal courts thus extends only to certain types of cases, identified either by subject matter or parties. The subject-matter heads of jurisdiction include federal questions ("all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made") and admiralty ("all Cases of admiralty and maritime Jurisdiction"). The party-based heads of jurisdiction include what might be called ordinary diversity ("Controversies . . . between Citizens of different States"), state-citizen diversity ("between a State and Citizens of another State"), and state-alien diversity ("between a State . . . and foreign . . . Citizens"). It is the latter two clauses, providing for state-citizen and state-alien diversity, that were

at the focus of the Court's decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), and the subsequent ratification of the Eleventh Amendment.

To understand the dispute concerning the state-citizen and state-alien diversity clauses, it is crucial to understand the relationship between the party-based and subject-matter heads of jurisdiction. The grants of jurisdiction in Article III are to be read disjunctively. The federal judicial power may extend to a case if it falls within *any* of the enumerated jurisdictional heads. Thus, a federal court can hear a federal-question case even if the parties are citizens of the same state; it can exercise jurisdiction over cases between citizens of different states even where the case does not arise under federal law. Most important for present purposes, the language of the unamended Article III alone would permit the federal courts to exercise jurisdiction over suits in which a noncitizen or alien is suing a State on a claim of a violation of state law.

This standard interpretation of Article III gave a special importance to the interpretation of the state-citizen and state-alien diversity clauses. The clauses by their terms permitted federal jurisdiction over any suit between a State and a noncitizen or a State and an alien, and in particular over suits in which the plaintiff was the noncitizen or alien and the defendant was the State. Yet in most of the States in 1789, the doctrine of sovereign immunity formally forbade the maintenance of suits against States in state courts, although the actual effect of this bar in frustrating legal claims against the State was unclear.[12] Thus, the question left open by the terms of the two clauses was whether the state law of

---

[12] Professor Jaffe has explained that the doctrine of sovereign immunity in English practice prior to 1789 rarely was a bar to effective relief for those who had legitimate claims against the government. See Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1 (1963). Judge Gibbons' recent essay similarly points out that the doctrine of sovereign immunity in the Colonies may also have had a very limited scope. See Gibbons, at 1895–1899.

sovereign immunity barred the exercise of the federal judicial power.

A plaintiff seeking federal jurisdiction against a State under the state-citizen or state-alien diversity clauses would be asserting a cause of action based on state law, since a federal question or admiralty claim would provide an independent basis for jurisdiction that did not depend on the identity of the parties. To read the two clauses to abrogate the state-law sovereign immunity defense would be to find in Article III a substantive federal limitation on state law. Although a State previously could create a cause of action to which it would not itself be liable, this same cause of action now could be used (at least by citizens of other States or aliens) in federal courts to sue the State itself. This was a particularly troublesome prospect to the States that had incurred debts, some of which dated back to the Revolutionary War. The debts would naturally find their way into the hands of noncitizens and aliens, who at the first sign of default could be expected promptly to sue the State in federal court. The State's effort to retain its sovereign immunity in its own courts would turn out to be futile. Moreover, the resulting abrogation of sovereign immunity would operate retroactively; even debts incurred years before the Constitution was adopted—and before either of the contracting parties expected that a judicial remedy against the State would be available—would become the basis for causes of action brought under the two clauses in federal court.

In short, the danger of the state-citizen and state-alien diversity clauses was that, if read to permit suits against States, they would have the effect of limiting state law in a way not otherwise provided for in the Constitution. The original Constitution prior to the Bill of Rights contained only a few express limitations on state power. Yet the States would now find in Article III itself a further limit on state action: Despite the fact that the State as sovereign had created a given cause of action, Article III would have made it impos-

sible for the State effectively to assert a sovereign immunity defense to that action.

The records of the Constitutional Convention do not reveal any substantial controversy concerning the state-citizen and state-alien diversity clauses.[13] The language of Article III,[14] which provides one guide to its meaning, is undoubtedly consistent with suits against States under both subject-matter heads of jurisdiction (for example, a suit arising out of federal law brought by a citizen against a State) and party-based heads of jurisdiction (for example, a suit brought under the state-citizen diversity clause itself). However, a federal-question suit against a State does not threaten to displace a prior state-law defense of sovereign immunity, because state-law defenses would not of their own force be applicable to federal causes of action. On the other hand, a state-citizen suit against a State does, as suggested above, threaten to displace any extant state-law sovereign immunity defense.

An examination of the debates surrounding the state ratification conventions proves more productive. The various

---

[13] See Fletcher, at 1045–1046; Jacobs, at 14–20.

[14] As reported by the Committee on Detail, the original draft provided that "[t]he jurisdiction of the supreme tribunal shall extend . . . to *such* other cases, as the national legislature may assign, as involving the national peace and harmony, in the collection of the revenue[,] in disputes between citizens of different states[,] in disputes between a State & a Citizen or Citizens of another State[,] in disputes between different states; and in disputes, in which subjects or citizens of other countries are concerned[,] & in Cases of Admiralty Jurisdn." (angle brackets in source omitted). 2 M. Farrand, Records of the Federal Convention of 1787, pp. 146–147 (rev. ed. 1937) (hereinafter Farrand). This jurisdiction was to be appellate only, "except in . . . those instances, in which the legislature shall make it original." *Ibid.* Interestingly, the Committee's draft of Article III was in James Wilson's handwriting, but the state-citizen diversity clause was written in the margin by another Committee member, John Rutledge of South Carolina. See Putnam, How the Federal Courts were Given Admiralty Jurisdiction, 10 Cornell L. Q. 460, 467 (1925) (facsimile of original document).

references to state sovereign immunity all appear in discussions of the state-citizen diversity clause. Virtually all of the comments were addressed to the problem created by state debts that predated the Constitution, when the State's creditors may often have had meager judicial remedies in the case of default. Yet, even in this sensitive context, a number of participants in the debates welcomed the abrogation of sovereign immunity that they thought followed from the state-citizen and state-alien clauses. The debates do not directly address the question of suits against States in admiralty or federal-question cases, where federal law and not state law would govern. Nonetheless, the apparent willingness of many delegates to read the state-citizen clause as abrogating sovereign immunity in state-law causes of action suggests that they would have been even more willing to permit suits against States in federal-question cases, where Congress had authorized such suits in the exercise of its Article I or other powers.

The Virginia debates included the most detailed discussion of the state-citizen diversity clause.[15] The first to mention the clause explicitly was George Mason, an opponent of the new Constitution. After quoting the clause, he referred to a

---

[15] A number of possible grounds for state liability existed in Virginia on the eve of that State's Ratification Convention. Aside from the problem of debts owed by the State, the Treaty of Paris of 1783, 8 Stat. 80, between Britain and the United States included a number of provisions that could subject the States to liability to British creditors. Article V of the Treaty recognized completed state confiscations, or escheats, of British property. Article VI, however, prohibited escheats that had not yet been completed. Virginia, like other States, had provided for the confiscation of debts owed to British creditors or the discharge of such debts by payment into the state treasury. See Gibbons, at 1903. The Treaty thus potentially subjected Virginia to substantial liability to British creditors trying to collect these debts, although enforcement of the Treaty's provisions was largely impossible under the Articles of Confederation. See generally id., at 1899–1902, 1903–1908.

dispute about Virginia's confiscation of property belonging to Lord Fairfax.[16] He asserted:

> "Claims respecting those lands, every liquidated account, or other claim against this state, will be tried before the federal court. Is not this disgraceful? Is this state to be brought to the bar of justice like a delinquent individual? Is the sovereignty of the state to be arraigned like a culprit, or private offender? Will the states undergo this mortification? I think this power perfectly unnecessary. But let us pursue this subject farther. What is to be done if a judgment be obtained against a state? Will you issue a *fieri facias?* It would be ludicrous to say that you could put the state's body in jail. How is the judgment, then, to be enforced? A power which cannot be executed ought not to be granted." 3 Elliot's Debates, at 526–527.

Mason thus believed that the state-citizen diversity clause provided federal jurisdiction for suits against the States and would have the effect of abrogating the State's sovereign immunity defense in state-law causes of action for debt that would be brought in federal court.

Madison responded the next day:

> "[Federal] jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court. This will give satisfaction to individuals, as it will prevent citizens, on whom a state may have a claim, being dissatisfied with the state courts." *Id.*, at 533.

---

[16] See also 3 J. Elliot, Debates on the Federal Constitution 529 (1891) (hereinafter Elliot's Debates) (further discussion of problem of land confiscation).

Madison seems to have believed that the Article III judicial power, at least under the state-citizen diversity clause, was limited to cases in which the States were plaintiffs. Although he does deny that "[i]t is in the power of individuals to call any State into court," this remark could be understood as an explication of current state law which he believed would not be displaced by the state-citizen diversity clause. His remarks certainly do not suggest that Congress, acting under its enumerated powers elsewhere in the Constitution, could not "call a state into court," or, again acting within its own granted powers, provide a citizen with the power to sue a State in federal court.

At any rate, the delegates were not wholly satisfied with Madison's explanation. Patrick Henry, an opponent of ratification, was the next speaker. Referring to Mason, he said: "My honorable friend's remarks were right, with respect to incarcerating a state. It would ease my mind, if the honorable gentleman would tell me the manner in which money should be paid, if, in a suit between a state and individuals, the state were cast." *Id.*, at 542. Returning to the attack on Madison, Henry had no doubt concerning the meaning of the state-citizen diversity clause:

> "As to controversies between a state and the citizens of another state, his construction of it is to me perfectly incomprehensible. He says it will seldom happen that a state has such demands on individuals. There is nothing to warrant such an assertion. But he says that the state may be plaintiff only. If gentlemen pervert the most clear expressions, and the usual meaning of the language of the people, there is an end of all argument. What says the paper? That it shall have cognizance of controversies between a state and citizens of another state, without discriminating between plaintiff and defendant. What says the honorable gentleman? The contrary— that the state can only be plaintiff. When the state is debtor, there is no reciprocity. It seems to me that

gentlemen may put what construction they please on it. What! is justice to be done to one party, and not to the other?" *Id.*, at 543.

Edmund Pendleton, the President of the Virginia Convention and the next speaker, supported ratification but seems to have agreed with Henry that the state-citizen diversity clause would subject the States to suit in federal court. He said that "[t]he impossibility of calling a sovereign state before the jurisdiction of another sovereign state, shows the propriety and necessity of vesting this tribunal with the decision of controversies to which a state shall be a party." *Id.*, at 549.

John Marshall next took up the debate:

"With respect to disputes between *a state and the citizens of another state,* its jurisdiction has been decried with unusual vehemence. I hope that no gentleman will think that a state will be called at the bar of the federal court. Is there no such case at present? Are there not many cases in which the legislature of Virginia is a party, and yet the state is not sued? It is not rational to suppose that the sovereign power should be dragged before a court. The intent is, to enable states to recover claims of individuals residing in other states. I contend this contruction is warranted by the words. But, say they, there will be a partiality in it if a state cannot be defendant—if an individual cannot proceed to obtain judgment against a state, though he may be sued by a state. It is necessary to be so, and cannot be avoided. I see a difficulty in making a state defendant, which does not prevent its being plaintiff. If this be only what cannot be avoided, why object to the system on that account? If an individual has a just claim against any particular state, is it to be presumed that, on application to its legislature, he will not obtain satisfaction? But how could a state recover any claim from a citizen of another

state, without the establishment of these tribunals?" *Id.*, at 555–556.

Marshall's remarks, like Madison's, appear to suggest that the state-citizen diversity clause could not be used to make an unwilling State a defendant in federal court. The reason seems to be that "it is not rational to suppose that the sovereign power should be dragged before a court." Of course, where the cause of action is based on state law, as it would be in a suit under the state-citizen diversity clause, the "sovereign power" whose law governed would be the State, and Marshall is consequently correct that it would be "irrational" to suppose that the sovereign could be forced to abrogate the sovereign immunity defense that its own law had created. However, where the cause of action is based on a federal law enacted pursuant to Congress' Article I powers, it would be far less clear that Marshall would have concluded that the State still retained the relevant "sovereignty"; in such a case, there is nothing "irrational" about supposing that the relevant sovereign—in this case, Congress—had subjected the State to suit.[17]

Marshall's observations did not go unanswered. Edmund Randolph, a member of the Committee of Detail at the Constitutional Convention and a proponent of the Constitution, referred back to Mason's remarks:

> "An honorable gentleman has asked, Will you put the body of the state in prison? How is it between independent states? If a government refuses to do justice to individuals, war is the consequence. Is this the bloody alternative to which we are referred. . . . I think, whatever the law of nations may say, that any doubt respecting the construction that a state may be plaintiff, and not

---

[17] To interpret Marshall's remarks to endorse a principle of wholesale state immunity from suit on *any* cause of action—state or federal—in federal court would render them inconsistent with the views he later expressed as Chief Justice. See *infra*, at 292–299.

> defendant, is taken away by the words *where a state shall be a party."  Id.*, at 573.

Randolph was convinced that a State could be made a party defendant.   Discussing some disputed land claims, he remarked: "One thing is certain—that . . . the remedy will not be sought against the settlers, but the state of Virginia.   The court of equity will direct a compensation to be made by the state."  *Id.*, at 574.   Finally, he concluded his discussion: "I ask the Convention of the free people of Virginia if there can be honesty in rejecting the government because justice is to be done by it?  . . . Are we to say that we shall discard this government because it would make us all honest?"  *Id.*, at 575.[18]   One of the purposes of Article III was to vest in the federal courts the power to settle disputes that might threaten the peace and unity of the Nation.[19]   Randolph saw the danger of just this kind of internecine strife when a State reneges on debts owed to citizens of another State, and consequently applauded the extension of federal jurisdiction to avoid these consequences.

The Virginia Convention ratified the Constitution.   The Madison and Marshall remarks have been cited as evidence of an inherent limitation on Article III jurisdiction.   See, *e. g., Edelman* v. *Jordan*, 415 U. S., at 660, n. 9; *Monaco* v. *Mississippi*, 292 U. S. 313, 323–325 (1934); *Hans* v. *Louisiana*, 134 U. S., at 14.   Even if this adequately characterized the substance of their views, they were a minority of those given at the Convention.   Mason, Henry, Pendleton, and Ran-

---

[18] Before the discussion of the state-citizen clause initiated by Mason, Randolph had earlier made much the same point while summarizing his views of the Constitution: "I admire that part which forces Virginia to pay her debts."   3 Elliot's Debates, at 207.

[19] For example the draft of the Constitution referred to the Committee on Detail at the Convention had provided "[t]hat the jurisdiction of the national Judiciary shall extend to cases arising under laws passed by the general Legislature, and to such other questions as involve the National peace and harmony."   2 Farrand, at 39.

dolph all took an opposing position.[20]   Equally important, the
entire discussion focused on the question of Virginia's liability
for debts and land claims that predated the Constitution and
clearly arose under Virginia law.   The question that excited
such interest was whether the state-citizen diversity clause
itself abrogated the sovereign immunity defense that would
be available to the State in a suit concerning these issues in
state court.[21]   The same issue arose in a few other state con-
ventions, but did not receive the detailed attention that it did
in Virginia.[22]

---

[20] It has been suggested that the remarks of the opponents of the Con-
stitution should be given less weight.   However, the same argument could
be made concerning the remarks of Madison and Marshall, especially in
light of Marshall's later interpretation of Article III as Chief Justice.   See
*infra,* at 295.   Their fervent desire for ratification could have led them to
downplay the features of the new document that were arousing contro-
versy.   See Field, at 534.

[21] The only element of the debate that suggests a broader concern is
the repeated reference to the problem of enforcing a judgment against
the State.   Of course, even these statements were made in the context of
the discussion of the state-citizen diversity clause, and the participants
in the debate may well not have had their attention directed to the need,
ultimately vindicated by the Civil War, to enforce federal law against the
States, regardless of the means necessary for enforcement.   In any event,
the Court has categorically rejected the difficulty of enforcing judgments
against the States as ground for permitting States to avoid their obliga-
tions.   It has long been established that a State may not claim sovereign
immunity when it is sued by another State under the Article III State-
State clause, see *South Dakota* v. *North Carolina,* 192 U. S. 286 (1904), or
when it is sued by the United States.   See *United States* v. *Texas,* 143
U. S. 621, 642–646 (1892).   Moreover, the prospective and injunctive relief
that is permitted in actions pleaded against a state official, see *Edelman* v.
*Jordan,* 415 U. S. 651 (1974), may raise enforcement problems as diffi-
cult as those raised by a judgment for damages in a suit against a State.
Cf. *Cooper* v. *Aaron,* 358 U. S. 1 (1958).

[22] For discussion of the state-citizen clause in other conventions, see Gib-
bons, at 1902–1903 (Pennsylvania), 1912–1914 (North Carolina); Fletcher,
at 1050–1051; Jacobs, at 27–40 (Pennsylvania).   In the Pennsylvania Con-
vention, for instance, James Wilson approved of the state-citizen clause

The debate in the press sheds further light on the effect of the Constitution on state sovereign immunity. A number of influential anti-Federalist publications sounded the alarm at what they saw as the unwarranted extension of the federal judicial power worked by the state-citizen diversity clause. The "Federal Farmer," commonly identified as Richard Henry Lee of Virginia, was one influential and widely published anti-Federalist. He objected:

> "There are some powers proposed to be lodged in the general government in the judicial department, I think very unnecessarily, *I mean powers respecting questions arising upon the internal laws of the respective states.* It is proper the federal judiciary should have powers co-extensive with the federal legislature—that is, the power of deciding finally on the laws of the union. By Art. 3. Sect. 2. the powers of the federal judiciary are extended (among other things) to all cases between a state and citizens of another state—between citizens of different states—between a state or the citizens thereof, and foreign states, citizens of subjects. Actions in all these cases, except against a state government, are now brought and finally determined in the law courts of the states respectively; and as there are no words to exclude these courts of their jurisdiction in these cases, they will have concurrent jurisdiction with the inferior federal courts in them." 14 The Documentary History of the Ratification of the Constitution 40 (J. Kaminski & G. Saladino, eds., 1983) (hereinafter Documentary History) (emphasis added).[23]

that had been drafted in his own Committee on Detail: "When a citizen has a controversy with another state, there ought to be a tribunal where both parties may stand on a just and equal footing." 2 Elliot's Debates, at 491.

[23] The essay cited here can also be found at 2 The Complete Anti-Federalist 245 (H. Storing ed. 1981). Professor Storing has questioned its attribution to Richard Henry Lee. *Id.*, at 214–216.

Later in the same essay, which was published and circulated in 1787 and 1788, see *id.*, at 14–17, the author becomes even more explicit:

"How far it may be proper to admit a foreigner or the citizen of another state to bring actions against state governments, which have failed in performing so many promises made during the war, is doubtful: How far it may be proper so to humble a state, as to bring it to answer to an individual in a court of law is worthy of consideration; the states are now subject to no such actions; and this new jurisdiction will subject the states, and many defendants to actions, and processes, which were not in the contemplation of the parties, when the contract was made; all engagements existing between citizens of different states, citizens and foreigners, states and foreigners; and states and citizens of other states were made the parties contemplating the remedies then existing on the laws of the states—and the new remedy proposed to be given in the federal courts, can be founded on no principle whatever." *Id.*, at 41–42.

This discussion undoubtedly presupposes that States would be parties defendant in suits on state-law causes of action under the state-citizen diversity clause; the author objects to barring sovereign immunity defenses in cases "arising upon the internal laws of the respective states." However, the anti-Federalist author plainly also believes that the powers of the federal courts are to be coextensive with the powers of Congress. Thus, the deficiency of state-citizen diversity jurisdiction is not that it permits the federal courts to hear suits against States based on federal causes of action, but that it permits the federal courts to exercise jurisdiction beyond the lawmaking powers of Congress: it provides new remedies for state creditors "which were not in the contemplation of the parties, when the contract was made."

Another noted anti-Federalist writer who published under the pseudonym "Brutus" also attacked what he saw as the untoward implications of the state-citizen diversity clause:

"I conceive the clause which extends the power of the judicial to controversies arising between a state and citizens of another state, improper in itself, and will, in its exercise, prove most pernicious and destructive.

"It is improper, because it subjects a state to answer in a court of law, to the suit of an individual. This is humiliating and degrading to a government, and, what I believe, the supreme authority of no state ever submitted to.

.        .        .        .        .

"Every state in the union is largely indebted to individuals. For the payment of these debts they have given notes payable to the bearer. At least this is the case in this state. Whenever a citizen of another state becomes possessed of one of these notes, he may commence an action in the supreme court of the general government; and I cannot see any way in which he can be prevented from recovering.

.        .        .        .        .

"If the power of the judicial under this clause will extend to the cases above stated, it will, if executed, produce the utmost confusion, and in its progress, will crush the states beneath its weight. And if it does not extend to these cases, I confess myself utterly at a loss to give it any meaning." 2 The Complete Anti-Federalist 429–431 (H. Storing ed. 1981).

Other materials, from proponents and opponents of ratification, similarly view Article III jurisdiction as extending to suits against States.[24] Timothy Pickering, a Pennsylvania

---

[24] See, e. g., J. Main, The Antifederalists 157 (1961) (quoting 1788 letter raising question whether state-citizen diversity clause would not "expose

landowner who supported ratification and attended the Pennsylvania Convention, wrote:

"The federal farmer, and other objectors, say the causes between a state & citizens of another state—between citizens of different states—and between a state, or the citizens thereof, and the citizens of subjects of foreign states, should be left, as they now are, to the decision of the particular state courts. The other cases enumerated in the constitution, seem to be admitted as properly cognizable in the *federal* courts. With respect to all the former, it may be said generally, that as the local laws of the several states may differ from each other—as particular states may pass laws unjust in their nature, or partially unjust as they regard foreigners and the citizens of other states, it seems to be a wise provision, which puts it in the power of such foreigners & citizens to resort to a court where they may reasonably expect to obtain *impartial* justice. . . . But there is a particular & very cogent reason for securing to *foreigners* a trial, either in the first instance, or by appeal, in a *federal* court. With respect to *foreigners*, all the states form but *one nation.* This *nation* is responsible for the conduct of all its members towards foreign nations, their citizens & subjects; and therefore ought to possess the

every State to be sued in the New Court, on their public securities holden by Citizens of other States"); 13 Documentary History, at 434 (widely reprinted essay by Federalist Tench Coxe) ("[W]hen a trial is to be had between the citizens of any state and those of another, or the government of another, the private citizen will not be obliged to go into a court *constituted by the state,* with which, or with the citizens of which, *his dispute is. He can appeal to a disinterested federal court*"); 14 Documentary History, at 72 (pro-Federalist pamphlet published in Philadelphia and reprinted elsewhere) ("[States] will indeed have the privilege of oppressing *their own citizens* by bad laws or bad administration; but the moment the mischief extends beyond their own State, and begins to affect the citizens of other States[,] strangers, or the national welfare,—the salutary controul of the supreme power will check the evil, and restore *strength and security,* as well as *honesty and right,* to the offending state").

power of doing justice to the latter. Without this power, a single state, or one of its citizens, might embroil the whole union in a foreign war." 14 Documentary History, at 204.

Pickering's comments are particularly revealing because, unlike the previous comments, they do not focus on the problem caused by the abrogation of sovereign immunity in state-law causes of action. In fact, his views seem to be consistent with the view that a federal court adjudicating a state-law claim should apply an applicable state-law sovereign immunity defense. Pickering justifies the existence of state-citizen diversity jurisdiction in part as a remedy for state laws that are unjust or unfair to noncitizens. Such laws would, of course, implicate the interests protected by the Privileges and Immunities Clause of Article IV. His comments, like those of the "Federal Farmer," thus suggest the recognized need for a federal forum to adjudicate cases implicating the guarantees of the Federal Constitution—even those cases in which a State is the defendant.

The Federalist Papers were written to influence the ratification debate in New York. In No. 81, Hamilton discussed the issue of state sovereign immunity in plain terms:

"I shall take occasion to mention here, a supposition which has excited some alarm upon very mistaken grounds: It has been suggested that an assignment of the public securities of one state to the citizens of another, would enable them to prosecute that state in the federal courts for the amount of those securities. A suggestion which the following considerations prove to be without foundation.

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a sur-

render of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of State sovereignty were discussed in considering the article of taxation and need not be repeated here. A recurrence to the principles there established will satisfy us, that there is no color to pretend that the state governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident, that it could not be done without waging war against the contracting State; and to ascribe to the federal courts, by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable." The Federalist No. 81, pp. 548–549 (J. Cooke ed. 1961) (emphasis in original).

Hamilton believed that the States could not be held to their debts in federal court under the state-citizen diversity clause. The Court has often cited the passage as support for its view that the Constitution, even before the Eleventh Amendment, gave the federal courts no authority to hear any case, under any head of jurisdiction, in which a State was an unconsenting defendant. See, *e. g.*, *Edelman* v. *Jordan*, 415 U. S., at 660–662, n. 9; *Hans* v. *Louisiana*, 134 U. S., at 12–13. A careful reading of this passage, however, in the context of Hamilton's views elsewhere in The Federalist, demonstrates precisely the opposite. In the cases arising under state law that would find their way into federal court under the state-

citizen diversity clause, a defense of state sovereign immunity would be as valid in federal court as it would be in state court. The States retained their full sovereign authority over state-created causes of action, as they did over their traditional sources of revenue. See The Federalist No. 32 (discussing taxation). On the other hand, where the Federal Government, in the "plan of the convention,"[25] had substantive lawmaking authority, the States no longer retained their full sovereignty and could be subject to suit in federal court.[26] In these areas, in which the Federal Government

---

[25] Hamilton used the phrase "plan of the convention" frequently as a synonym for the Constitution. See The Federalist Concordance 403–404 (Engeman, Erler, & Hofeller, eds. 1980). In No. 32, the discussion of taxation to which Hamilton adverted in No. 81, Hamilton had said that "as the plan of the convention aims only at a partial Union or consolidation, the State Governments would clearly retain all the rights of sovereignty which they before had and which were not by that act *exclusively* delegated to the United States." The Federalist No. 32, p. 200 (J. Cooke ed. 1961) (emphasis in original). The Constitution had not delegated to the National Government the general power to define defenses to state-law causes of action; consequently, nothing in Article III abrogated state sovereign immunity in state-law causes of action in federal or state courts. On the other hand, the Constitution *had* delegated to the National Government a series of enumerated powers, and had made federal laws enacted pursuant thereto the supreme law of the land. Therefore, the States had surrendered their immunity from suit on federal causes of action when the Constitution was ratified.

In No. 80, Hamilton discussed the need for the federal-question jurisdiction:

"What for instance would avail restrictions on the authority of the state legislatures, without some constitutional mode of enforcing the observance of them? The states, by the plan of the convention are prohibited from doing a variety of things; some of which are incompatible with the interests of the union, and others with the principles of good government." The Federalist No. 80, p. 350 (J. Cooke ed. 1961).

The constitutional mode for enforcing the federal laws, according to Hamilton, was the federal judiciary. *Ibid.* Again, insofar as the States have thus given up powers to the Federal Government in the "plan of the convention," they are no longer full sovereigns and may be subjected to suit.

[26] A number of scholars have noted comments by Hamilton elsewhere in The Federalist Papers that strongly suggest that he foresaw the necessity

had substantive lawmaking authority, Article III's federal-question grant of jurisdiction gave the federal courts power that extended just as far as the legislative power of Congress; as Hamilton had said in discussing the judicial power, "every government *ought to possess the means of executing its own provisions by its own authority,*" The Federalist No. 80, p. 537 (J. Cooke ed. 1961) (emphasis in original).[27] To interpret Article III to impose an independent limit on the lawmaking power of Congress would be to turn the "plan of the convention" on its head.[28]

A sober assessment of the ratification debates thus shows that there was no firm consensus concerning the extent to which the judicial power of the United States extended to suits against States. Certain opponents of ratification, like

---

for suits against States in federal court. See Fletcher, at 1048; Gibbons, at 1908–1912; Field, at 534–535.

[27] The view that the power of the federal courts under federal-question jurisdiction had to be congruent with the power of Congress to legislate under Article I is strongly supported by other writings of Hamilton, as well as by other comments made in defense of Article III. See, *e. g.*, The Federalist, No. 80, p. 535 (J. Cooke ed. 1961) ("If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be ranked among the number"); 3 Elliot's Debates, at 532 (remarks of Madison) ("With respect to the laws of the Union, it is so necessary and expedient that the judicial power should correspond with the legislative, that it has not been objected to").

[28] One final piece of evidence concerning the meaning of the original Article III comes from the amendments proposed by the various state ratification conventions. The New York Convention submitted an amendment to the First Congress that "nothing in the Constitution now under consideration contained, is to be construed to authorize any suit to be brought against any state, in any manner whatever." 2 Elliot's Debates, at 409. This suggests at least that the New York delegates did not agree with Hamilton's reading of the state-citizen diversity clause. Virginia, North Carolina, Rhode Island, Massachusetts, and New Hampshire also proposed amendments that would have modified or eliminated the state-citizen diversity clause. See Fletcher, at 1051–1052. The felt need for such amendments suggests that the delegates to these conventions did not find such a limitation in Article III itself.

Mason, Henry, and the "Federal Farmer," believed that the state-citizen diversity clause abrogated state sovereign immunity on state causes of action and predicted dire consequences as a result. On the other hand, certain proponents of the Constitution, like Pendleton, Randolph, and Pickering, agreed concerning the interpretation of Article III but believed that this constituted an argument in favor of the new Constitution. Finally, Madison, Marshall, and Hamilton believed that a State could not be made a defendant in federal court in a state-citizen diversity suit. The majority of the recorded comments on the question contravene the Court's statement in *Hans,* see *supra,* at 259, that suits against States in federal court were inconceivable.[29]

Granted that most of the comments thus expressed a belief that state sovereign immunity would not be a defense to suit in federal court in state-citizen diversity cases, the question remains whether the debates evince a contemporary understanding concerning the amenability of States to suit under federal-question or other subject-matter grants of jurisdiction. Although this question received little direct attention, the debates permit some conclusions to be drawn. First, the belief that the state-citizen diversity clause abrogated state sovereign immunity in federal court implies that the federal question and admiralty clauses would have the same effect. It would be curious indeed if Article III abrogated a State's immunity on causes of action that arose under the State's own laws and over which the Federal Government had no legislative authority, but gave a State an absolute right to a sovereign immunity defense when it was charged with a violation of federal law. Second, even Hamilton, who believed that the state-citizen clause did not abrogate state sovereign immunity in federal court, also left substantial room for suits

---

[29] Indeed, recent scholarship seems unanimously to agree that the weight of the evidence is against the Court's statement in *Hans.* See Jacobs, at 40; Field, at 531; Gibbons, at 1913–1914; Fletcher, at 1054.

against States when "the plan of the convention" required this result. Given the Supremacy Clause and the enumeration of congressional powers in Article I, "the plan of the convention" requires States to answer in federal courts for violations of duties lawfully imposed on them by Congress in the exercise of its Article I powers. Third, the repeated references by Hamilton and others to the need for the federal courts to be able to exercise jurisdiction that is as extensive as Congress' powers to legislate suggests that, if Congress had the substantive power under Article I to enact legislation providing rights of action against the States, the federal courts under Article III could be given jurisdiction to hear such cases.

B

After the ratification of the Constitution, Congress provided in § 13 of the First Judiciary Act, 1 Stat. 73, 80, that "the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a state is a party, except between a state and its citizens; and except also between a state and citizens of other states, or aliens, in which latter case it shall have original but not exclusive jurisdiction." The Act did not provide the federal courts with original federal-question jurisdiction, although it did in § 25 provide the Supreme Court with considerable jurisdiction over appeals in federal-question cases from state courts. Despite the controversy over the suability of the States, the provision of the Act giving the Supreme Court original jurisdiction under the state-citizen and state-alien diversity clauses surprisingly aroused little or no debate in Congress. See Fletcher, at 1053–1054.[30]

---

[30] The First Judiciary Act itself may well suggest Congress' understanding that States would be suable in federal court under the state-citizen diversity clause. Although § 13 of the Act did not differentiate between States as plaintiffs and States as defendants, the same section provided that the Supreme Court "shall have exclusively all such jurisdiction of suits or proceedings against ambassadors . . . as a court of law can have or exercise consistently with the law of nations." If Congress had thought that

Those with disputes against States had no doubt that state-citizen diversity jurisdiction gave them a remedy in federal court. The first case docketed in this Court was *Vanstophorst* v. *Maryland*, 2 Dall. 401 (1791), a suit by Dutch creditors who sought judgments to recover principal and interest on Revolutionary War loans to the State of Maryland. Although a number of other cases were brought against States prior to the passage of the Eleventh Amendment,[31] the most significant of course was *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). *Chisholm* was an action in assumpsit by a citizen of South Carolina for the price of military goods sold to Georgia in 1777.[32] The case squarely presented the question whether a State could be sued in federal court.

The Court held that federal jurisdiction extended to suits against States under the state-citizen diversity clause. Each of the five sitting Justices delivered an opinion; only Justice Iredell was in dissent. Several features of *Chisholm* are

States could not, or ought not, be suable in federal court under the state-citizen diversity clause, it easily could have provided that the Supreme Court shall exercise such jurisdiction against a State "as a court can have or exercise consistently with that state's law." In addition, elsewhere in the Act, Congress assigned jurisdiction over cases in which the United States was the *plaintiff*. See § 9, 1 Stat. 77 (district court jurisdiction of "all suits at common law where the United States sue" subject to jurisdictional amount); § 11, 1 Stat. 78 (circuit court jurisdiction of all civil suits where $500 or more is in dispute "and the United States are plaintiffs, or petitioners"). Congress exercised no such discrimination in assigning jurisdiction in cases "between a state and citizens of another state."

[31] See Mathis, The Eleventh Amendment: Adoption and Interpretation, 2 Ga. L. Rev. 207, 215–230 (1968) (discussing cases); Jacobs, at 41–47, 57–64 (same).

[32] The precise facts of *Chisholm* have been the subject of some scholarly dispute. Compare 1 C. Warren, The Supreme Court in United States History 93, n. 1 (1922) (plaintiff in *Chisholm* was executor asserting claim on behalf of estate of British citizen), with Mathis, 2 Ga. L. Rev., at 217–218 (plaintiff in *Chisholm* was executor of estate of South Carolina citizen). The traditional account, in which the plaintiff was identified as acting on behalf of a British citizen, may explain why the Eleventh Amendment modified the state-alien diversity clause as well as the state-citizen diversity clause.

crucial to an understanding of the meaning of the Eleventh Amendment.  First, two members of the Committee on Detail that had drafted Article III at the Convention were involved in the *Chisholm* case.  Both believed that a State could be sued in federal court.  Edmund Randolph, Washington's Attorney General who had previously represented the plaintiff in *Vanstophorst* v. *Maryland, supra,* represented the *Chisholm* plaintiff and argued strongly that a State must be amenable to suit in federal court as a result of the plain words of Article III, 2 Dall., at 421, the necessity for enforcing the constitutional prohibitions on the States, *id.,* at 422, and the implicit consent to suit that occurred on ratification of the Constitution, *id.,* at 423.  Justice James Wilson, another of the drafters of Article III, delivered a lengthy opinion in which he urged that sovereign immunity had no proper application within the new Republic.  *Id.,* at 453–466.

Second, *Chisholm* was not a federal-question case.  Although the case involved a contract, it was brought pursuant to the state-citizen diversity clause and not directly under the Contracts Clause of the Constitution.  See *id.,* at 420 (argument of counsel).[33]  The case thus squarely raised the issue whether a suit against a State based on a state-law cause of action that was not maintainable in state court could be brought in federal court pursuant to the state-citizen diversity clause.  The case did *not* present the question whether a

---

[33] Most likely, *Chisholm* could not have been brought directly under the Contracts Clause of the Constitution.  Prior to *Fletcher* v. *Peck,* 6 Cranch 87 (1810), it was not at all clear that the Contracts Clause applied to contracts to which a State was a party.  Moreover, the case involved a simple breach of contract, not a "law impairing the obligation of the contract" to which the Clause would have applied.  See *Shawnee Sewerage & Drainage Co.* v. *Stearns,* 220 U. S. 462, 471 (1911); *Brown* v. *Colorado,* 106 U. S. 95, 98 (1882).  Finally, it was certainly not clear at the time of *Chisholm* that the Contracts Clause provided a plaintiff with a private right of action for damages.  *Chisholm* was thus a suit on a state-law cause of action in assumpsit against the State of Georgia pursuant to the state-citizen diversity clause.

State could be sued in federal court where the cause of action arose under federal law.

Third, even Justice Iredell's dissent did not go so far as to argue that a State could *never* be sued in federal court. He sketched his argument as follows:

"I have now, I think, established the following particulars. —1st. That the Constitution, so far as it respects the judicial authority, can only be carried into effect by acts of the Legislature appointing Courts, and prescribing their methods of proceeding. 2d. That Congress has provided no new law in regard to this case, but expressly referred us to the old. 3d. That there are no principles of the old law, to which we must have recourse, that in any manner authorize the present suit, either by precedent or by analogy." *Id.*, at 449.

He thus accurately perceived that the question presented was whether Article III itself created a cause of action in federal court to displace state law where a State was being sued. Because he believed that it did not, and because he found no *other* source of law on which the State could be held liable in the case, he believed that the suit could not be maintained.[34]

The decision in *Chisholm* was handed down on February 18, 1793. On February 19, a resolution was introduced in the House of Representatives stating:

"[N]o State shall be liable to be made a party defendant in any of the Judicial Courts established or to be established under the authority of the United States, at the

---

[34] Justice Iredell added, in what he conceded to be dicta: "So much, however, has been said on the Constitution, that it may not be improper to intimate that my present opinion is strongly against any construction of it, which will admit, under any circumstances, a compulsive suit against a State for the recovery of money." 2 Dall., at 449. He emphasized, however, that he need not decide this broader question: "This opinion I hold, however, with all the reserve proper for one, which, according to my sentiments in this case, may be deemed in some measure extra-judicial." *Id.*, at 450.

suit of any person or persons, citizens or foreigners, or of any body politic or corporate whether within or without the United States." 1 C. Warren, The Supreme Court in United States History 101 (rev. ed. 1937).[35]

Another resolution was introduced in the Senate on February 20. That resolution provided:

"The Judicial power of the United States shall not extend to any suits in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." 3 Annals of Cong. 651–652 (1793).

Congress then recessed on March 4, 1793, without taking any action on the proposed Amendment.

By the time Congress reconvened in December 1793, a suit had been brought against Massachusetts in the Supreme Court by a British Loyalist whose properties had been confiscated. *Vassal* v. *Massachusetts*.[36] Georgia had responded angrily to the decision in *Chisholm*, and the Massachusetts Legislature reacted to the suit against it by enacting a resolution calling for "the most speedy and effectual measures" to obtain a constitutional amendment, including a constitutional convention. Resolves of Massachusetts 28 (1793) (No. 45). Virginia followed with a similar resolution. Acts of Virginia 52 (1793). The issue had thus come to a head, and the Federalists who controlled Congress no doubt felt considerable pressure to act to avoid an open-ended constitutional convention.[37]

---

[35] The resolution was not reported in the Annals of Congress, but was reported in contemporary newspaper accounts. See Gibbons, at 1926, n. 186.

[36] The case is unreported, but is discussed in 1 J. Goebel, History of the Supreme Court of the United States 734–735 (1971).

[37] For a more detailed explanation of the political situation facing the Washington administration and the Congress at the time, see Gibbons, at 1927–1932.

On January 2, 1794, a resolution was introduced, by a Senator whose identity is not now known, with the text of the Eleventh Amendment as it was ultimately enacted:

> "The Judicial power of the United States shall not *be construed to* extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." 4 Annals of Cong. 25 (1794) (emphasis added).

This differed from the original February 20 resolution only in the addition of the three italicized words. Senator Gallatin moved to amend the resolution to add the words "except in cases arising under treaties made under the authority of the United States" after "The Judicial power of the United States." *Id.*, at 30. After rejecting Gallatin's proposal, the Senate then rejected an amendment offered by an unknown Senator that would have forbidden suits against States only "where the cause of action shall have arisen before the ratification of this amendment." *Ibid.*[38] The Senate ultimately voted 23–2 in favor of the Amendment. *Ibid.*

In the House of Representatives, there was only one attempt to amend the resolution. The amendment would have added at the end of the Senate version the following language: "[w]here such State[s] shall have previously made provision in their own Courts, whereby such suit may be prosecuted to effect." *Id.*, at 476. This resolution, of course, would have ratified the *Chisholm* result that States could be sued under the state-citizen diversity clause, but would have given the States an opportunity to shift the litigation into

---

[38] The Amendment read in full:

"The Judicial power of the United States extends to all cases in law and equity in which one of the United States is a party; but no suit shall be prosecuted against one of the United States by citizens of another State, or by citizens of subjects of a foreign State, where the cause of action shall have arisen before the ratification of this amendment."

their own courts. It was rejected, 77–8, and the House proceeded to ratify the Amendment by a vote of 81–9 on March 4, 1794. *Id.*, at 476–478. Although the chronology of ratification is somewhat unclear,[39] President Adams certified that it had been ratified four years later on January 8, 1798.

Those who have argued that the Eleventh Amendment was intended to constitutionalize a broad principle of state sovereign immunity have always elided the question of why Congress would have chosen the language of the Amendment as enacted to state such a broad principle. As shown above, there was—to say the least—no consensus at the time of the Constitution's ratification as to whether the doctrine of state sovereign immunity would have any application in federal court. Even if there had been such a consensus, however, the Eleventh Amendment would represent a particularly cryptic way to embody that consensus in the Constitution. Had Congress desired to enshrine state sovereign immunity in federal courts for all cases, for instance, it could easily have adopted the first resolution introduced on February 19, 1793, in the House. Alternatively, a strong sovereign immunity principle could have been derived from an amendment that merely omitted the last 14 words of the enacted resolution. See Gibbons, at 1927. However, it does not take a particularly close reading of the Eleventh Amendment to see that it stops far short of that. Article III had provided: "The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of another State" and "between a State . . . and foreign . . . Citizens or Subjects." The Eleventh Amendment used the identical language in stating that the judicial power did not extend to "any suit in law or equity . . . against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State." The congruence of language suggests that the Amendment was

---

[39] See Jacobs, at 67, nn. 95–99.

intended simply to adopt the narrow view of the state-citizen and state-alien diversity clauses; henceforth, a State could not be sued in federal court where the basis of jurisdiction was that the plaintiff was a citizen of another State or an alien.[40]

It may be argued that the true intentions of the Second Congress were revealed by its use of the words "shall not be

---

[40] It might be argued that, because Congress rejected Senator Gallatin's proposal, which would have exempted treaty-based causes of action from the operation of the Amendment, Congress intended to leave intact no part of the federal-question jurisdiction that would potentially have left the States open to suit. This argument, however, is untenable. First, it ignores the language of the Amendment. If Congress were generally concerned with suits against States under *all* Article III heads of jurisdiction, it would have had no rational reason to direct the Eleventh Amendment only against suits by noncitizens or foreigners. Second, Congress may well have rejected Gallatin's proposal precisely because to adopt that proposal would have implied some limitation on the ability of the federal courts to hear nontreaty based federal-question claims. Thus, Congress' rejection of the proposal may well have been based on its desire to preserve the full contours of Article III federal-question jurisdiction, rather than on a desire to limit it. Third, the federal courts had no general original federal-question jurisdiction under the First Judiciary Act, although the Supreme Court did have substantial appellate federal-question jurisdiction over cases originating in state courts. In refusing in the First Judiciary Act to grant original federal-question jurisdiction to the federal courts, Congress had evidently decided that federal-question cases, even those arising out of the Treaty of Paris, should be heard in the first instance in state court. In deciding to enact the Eleventh Amendment to overrule *Chisholm*, Congress had decided that the state-citizen and state-alien clauses ought not permit suits against States in federal court. Given these two decisions, Congress had little reason to make an exception to both decisions for suits that arose out of the Treaty. Finally, the case of *Vassal* v. *Massachusetts*, in which a British Loyalist had brought a challenge under the state-alien clause to the State's confiscation of his property, had triggered a movement for a constitutional convention. See *supra*, at 284. By rejecting the Gallatin proposal, which would have authorized the *Vassal* suit, Congress no doubt acted in part to squelch the movement for an open-ended constitutional convention.

construed" in the text of the Amendment. According to this argument, Congress intended not merely to qualify the state-citizen and state-alien diversity clauses, but also to establish a rule of construction barring exercise of the federal jurisdiction in any case—even one otherwise maintainable under the subject-matter heads of jurisdiction—in which a noncitizen or alien was suing a State. This view at least is consistent with the language of the Amendment, and would lead to the conclusion that suits by noncitizens or aliens against a State are never permitted, while suits by a citizen are permissible.[41] Recent scholarship, however, suggests strongly that this view is incorrect. In particular, two other explanations for the use of these terms have been advanced. Some have argued that the words were a natural means for Congress to rebuke the Supreme Court for its construction of the words "between a State and citizens of another State" in *Chisholm;* no longer should those words be construed to extend federal jurisdiction to suits brought under that clause in which the State was a defendant. See, *e. g.,* Fletcher, at 1061–1062. Others have argued that the words were added to assure the retrospective application of the Eleventh Amendment. See, *e. g.,* Jacobs, at 68–69. Of course, if the latter meaning were intended, the words had their intended effect, for the Court dismissed cases pending on its docket under the state-citizen diversity clause when the Amendment was ratified. *E. g., Hollingsworth* v. *Virginia,* 3 Dall. 378 (1798).[42]

---

[41] When the Court is prepared to embark on a defensible interpretation of the Eleventh Amendment consistent with its history and purposes, the question whether the Amendment bars federal-question or admiralty suits by a noncitizen or alien against a State would be open. At the current time, as the text states, the commentators' arguments against this interpretation seem to me quite plausible.

[42] In any event, I find it much more plausible to leave the construction of these words somewhat unclear than to leave the construction of much of the Amendment a superfluity, as the Court's construction would do.

The language of the Eleventh Amendment, its legislative history, and the attendant historical circumstances all strongly suggest that the Amendment was intended to remedy an interpretation of the Constitution that would have had the state-citizen and state-alien diversity clauses of Article III abrogating the state law of sovereign immunity on state-law causes of action brought in federal courts. The economy of this explanation, which accounts for the rather legalistic terms in which the Amendment and Article III were written, does not require extravagant assumptions about the unexpressed intent of Congress and the state legislatures, and is itself a strong point in its favor. The original Constitution did not embody a principle of sovereign immunity as a limit on the federal judicial power. There is simply no reason to believe that the Eleventh Amendment established such a broad principle for the first time.

The historical record in fact confirms that, far from correcting the error made in *Chisholm*, the Court's interpretation of the Eleventh Amendment makes a similar mistake. The *Chisholm* Court had interpreted the state-citizen clause of Article III to work a major substantive change in state law, or at least in those cases arising under state law that found their way to federal court. The Eleventh Amendment corrected that error, and henceforth required that the party-based heads of jurisdiction in Article III be construed not to work this kind of drastic modification of state law. The Court's current interpretation of the Eleventh Amendment makes the opposite mistake, construing the Eleventh Amendment to work a major substantive change in federal law. According to the Court, the Eleventh Amendment imposes a substantive limit on the Necessary and Proper Clause of Article I, limiting the remedies that Congress may authorize for state violations of federal law. This construction suffers from the same defect as that of *Chisholm:* both construe the enumeration of heads of jurisdiction to impose substantive limits on lawmaking authority.

Article III grants a federal-question jurisdiction to the federal courts that is as broad as is the lawmaking authority of Congress. If Congress acting within its Article I or other powers creates a legal right and remedy, and if neither the right nor the remedy violates any provision of the Constitution outside Article III, then Congress may entrust adjudication of claims based on the newly created right to the federal courts — even if the defendant is a State. Neither Article III nor the Eleventh Amendment imposes an independent limit on the lawmaking authority of Congress. This view makes sense of the language, history, and purposes of Article III and of the Eleventh Amendment. It is also the view that was adopted in the earliest interpretations of the Amendment by the Marshall Court.

## C

After the enactment of the Eleventh Amendment, the number of suits against States in the federal courts was largely curtailed. The Amendment itself had eliminated the constitutional basis for the provisions of the First Judiciary Act granting the Supreme Court original jurisdiction over suits against States by an alien or noncitizen. Because there was no general statutory grant of original federal-question jurisdiction to the federal courts,[43] suits against States would not arise under that head of jurisdiction.[44] Nonetheless, the Marshall Court did have a number of opportunities to confront the issue of state sovereign immunity. The Court's decisions reflect a consistent understanding of the limited effect of the Amendment on the structure of federal jurisdiction outside the state-citizen and state-alien diversity clauses. Because the Justices on the Marshall Court lived through the

---

[43] The Judiciary Act of 1801, 2 Stat. 89, did grant general federal-question jurisdiction to the federal circuit courts, but that grant was repealed one year later. 2 Stat. 132, 156 (1802).

[44] Nor could a suit against a State be brought under diversity jurisdiction, because a State is not a citizen of itself for such purposes. See *Postal Telegraph Cable Co.* v. *Alabama,* 155 U. S. 482 (1894).

ratification of the Constitution, the decision in *Chisholm* v. *Georgia,* and the subsequent enactment of the Eleventh Amendment, the Marshall Court's views on the meaning of the Amendment should take on particular importance.

### (1)

Admiralty was perhaps the most significant head of federal jurisdiction in the early 19th century. As Hamilton noted in a much-quoted passage from the Federalist Papers: "The most bigoted idolizers of State authority have not thus far shewn a disposition to deny the national judiciary the cognizance of maritime causes." The Federalist No. 80, p. 538 (J. Cooke ed. 1961). Although few admiralty cases could be expected to arise in which the States were defendants, the Marshall Court in the few instances in which it confronted the issue showed a strong reluctance to construe the Eleventh Amendment to interfere with the admiralty jurisdiction of the federal courts.

In *United States* v. *Peters,* 5 Cranch 115 (1809), the Court adjudicated a controversy over whether certain funds, proceeds of an admiralty prize sale dating from the 1770's, belonged to the Commonwealth of Pennsylvania or to a private claimant. *Id.,* at 136–139. The Commonwealth claimed the money as the result of a state-court judgment in its favor, while the private claimant's claim was based on a judgment received from a national prize court established under the Articles of Confederation. The money claimed by the Commonwealth had been held by the State Treasurer, who had since died. Chief Justice Marshall, writing for the Court, held that the Eleventh Amendment did not interfere with the traditional common-law suit against a state official for recovery of funds held with notice of an adverse claim. According to Marshall, the suit could be maintained against the state official, even though the relief sought was a recovery of funds. Marshall carefully avoided deciding whether the Eleventh Amendment would have barred the action if it had been nec-

essary to bring it against the State itself: "If these proceeds had been the actual property of Pennsylvania, however wrongfully acquired, the disclosure of that fact would have presented a case on which it was unnecessary to give an opinion." *Id.*, at 139. Nonetheless, Marshall's construction of the Eleventh Amendment by preserving the essential remedy of a money judgment that, in effect, ran against the State, left federal admiralty jurisdiction intact.

Later that same year, Justice Bushrod Washington, who had sat on the *Peters* Court, heard a sequel to *Peters* that arose when the State resisted the execution of the *Peters* judgment. *United States* v. *Bright*, 24 F. Cas. 1232 (No. 14,647) (CC Pa. 1809). After agreeing with the *Peters* Court that the State Treasurer could be sued for the funds in his private capacity, he went on to note that the Eleventh Amendment in terms applies only to suits "in law or equity." Because the Framers of the Amendment did *not* add the words "or to cases of admiralty and maritime jurisdiction," *id.*, at 1236, the Amendment should not be construed to extend to admiralty cases.[45] Washington thus did not read the Amendment to require a broad constitutional prohibition of suits against States in federal court. Moreover, given the importance of admiralty jurisdiction at the time, Congress' failure to include admiralty suits in the express terms of the statute was unlikely to have been an oversight.

The Marshall Court again refused to hold that the Eleventh Amendment barred suits in admiralty against States in *Governor of Georgia* v. *Madrazo*, 1 Pet. 110 (1828). On ap-

---

[45] Justice Washington explained the exclusion of admiralty jurisdiction in part on the ground that admiralty proceedings are often *in rem* and that a judgment could thus be enforced without implicating the "delicate" question of how to execute a judgment against a State. *United States* v. *Bright*, 24 F. Cas., at 1236. Although this concern echoed some of the difficulties raised in the debate over ratification of the Constitution, the difficulty of executing a judgment against a State was ultimately rejected by the Court as a ground to expand state sovereign immunity in federal court. See *supra*, at 270, n. 21.

peal from a Federal Circuit Court decision, a claimant alleged that he, and not the State of Georgia, was entitled to the proceeds of a prize sale. Chief Justice Marshall, writing for the Court, held that the suit was in reality a suit against the State. Although the Governor was named as defendant, there was no allegation that he had violated any federal or state law, and thus "no case is made which justifies a decree against him personally." *Id.*, at 123. The Court then dismissed the case because the Circuit Court had no jurisdiction over it: "[I]f the 11th amendment to the Constitution, does not extend to proceedings in admiralty, it was a case for the original jurisdiction of the Supreme Court." *Ibid.*[46]

Writing in 1833, Justice Joseph Story noted:

"It has been doubted, whether this amendment extends to cases of admiralty and maritime jurisdiction, where the proceeding is *in rem* and not *in personam*. There, the jurisdiction of the court is founded upon the possession of the thing; and if the state should interpose a claim for the property, it does not act merely in the character of a defendant, but as an actor. Besides the language of the amendment is, that 'the judicial power of the United States shall not be construed to extend to any suit *in law or equity*.' But a suit in the admiralty is not, correctly speaking, a suit in law, or in equity; but is often spoken of in contradistinction to both." 3 J. Story, Commentaries on the Constitution of the United States 560–561 (1833).[47]

---

[46] In 1833, the Court dismissed an original action brought by Madrazzo based on the same claim. *Ex parte Madrazzo*, 7 Pet. 627 (1833). The Court's one-paragraph opinion apparently dismissed the case on Eleventh Amendment grounds because it "is a mere personal suit against a state to recover proceeds in its possession." *Id.*, at 632. This was the only case dismissed by the Supreme Court on Eleventh Amendment grounds between *Hollingsworth* v. *Virginia*, 3 Dall. 378 (1798), and the Civil War.

[47] Justice Story cited *Peters*, *Bright*, and *Madrazzo* in support of his statement.

As Justice Story pointed out, the result of the early admiralty cases was that the Eleventh Amendment was not seen as an obstacle to the exercise of otherwise legitimate federal admiralty jurisdiction.

(2)

Until 1875, Congress did not endow the federal courts with general federal-question jurisdiction. Nonetheless, the Supreme Court had several opportunities to decide federal-question cases against States. In some of these, suit was brought against a State in state court and an appeal was taken to the Supreme Court. If the Eleventh Amendment had constitutionalized state sovereign immunity as a limit to the Article III federal judicial power, it would have operated as a limit on both original *and* appellate federal-question jurisdiction, for nothing in the text or subsequent interpretations of Article III suggests that the federal judicial power extends more broadly to hear appeals than to decide original cases.[48] Although the Court has largely ignored this consequence of its constitutional sovereign immunity doctrine,[49] it was a consequence that the Marshall Court squarely faced.

In *Cohens* v. *Virginia,* 6 Wheat. 264 (1821), Chief Justice Marshall addressed the question of the effect of the Eleventh Amendment on the Supreme Court's appellate jurisdiction to review a criminal conviction obtained in a Virginia state court. Counsel for the State argued that either the original

---

[48] See *Doremus* v. *Board of Education,* 342 U. S. 429 (1952) (Article III limits on federal jurisdiction apply to appeal of case from New Jersey state courts).

[49] Cf. *Smith* v. *Reeves,* 178 U. S. 436, 445 (1900) (State may consent to suit in its own courts "subject always to the condition, arising out of the supremacy of the Constitution of the United States and the laws made in pursuance thereof, that the final judgment of the highest court of the State in any action brought against it with its consent may be reviewed or re-examined, as prescribed by the act of Congress, if it denies to the plaintiff any right, title, privilege or immunity secured to him and specially claimed under the Constitution or laws of the United States").

Constitution or the Eleventh Amendment denied the federal courts the power to hear such an appeal, in which a State was being "sued" for a writ of error in the Supreme Court. Marshall noted at the outset of his opinion for the Court that Article III provides federal jurisdiction "to all the cases described, without making in its terms any exception whatever, and without any regard to the condition of the party." *Id.*, at 378. After repeating this principle several times,[50] the Chief Justice stated: "We think, then, that as the constitution originally stood, the appellate jurisdiction of this Court, in all cases arising under the constitution, laws, or treaties of the United States, was not arrested by the circumstance that a State was a party." *Id.*, at 405.

Marshall then went on to consider the applicability of the Eleventh Amendment. After holding that a criminal defendant's petition for a writ of error is not properly understood to be a suit "commenced" or "prosecuted" by an individual against a State, Marshall stated an alternative holding:

> "But should we in this be mistaken, the error does not affect the case now before the Court. If this writ of

---

[50] The repetitions of this principle make the point unmistakably. He states that the judicial department "is authorized to decide all cases, of every description, arising under the constitution or laws of the United States. From this general grant of jurisdiction, no exception is made of those cases in which a State may be a party." 6 Wheat., at 382. "We think a case arising under the constitution or laws of the United States, is cognizable in the courts of the Union, whoever may be the parties to that case." *Id.*, at 383. "[W]e think that the judicial power, as originally given, extends to all cases arising under the constitution or a law of the United States, whoever may be the parties." *Id.*, at 392. It is worth noting that the Court has often given a broad reading to Marshall's statements in the Virginia Ratification Convention, interpreting those statements to express Marshall's view that a constitutional doctrine of state sovereign immunity in federal courts was an element of the original understanding of Article III. See, *e. g.*, *Hans* v. *Louisiana*, 134 U. S. 1 (1890); *Monaco* v. *Mississippi*, 292 U. S. 313, 324 (1934). The Chief Justice's discussion in *Cohens*, however, demonstrates that it may be prudent to give his earlier statements the less expansive interpretation suggested *supra*, at 267–268.

error be a suit in the sense of the 11th amendment, it is not a suit commenced or prosecuted 'by a citizen of another State, or by a citizen or subject of any foreign State.' It is not then within the amendment, but is governed entirely by the constitution as originally framed, and we have already seen that, in its origin, the judicial power was extended to all cases arising under the constitution or laws of the United States, without respect to parties." *Id.*, at 412.[51]

Thus, the Marshall Court in *Cohens* squarely confronted the issue of the extent to which the Eleventh Amendment encroached on federal-question jurisdiction, and concluded that it made no encroachment at all. This result is not distinguishable on the ground that it concerned only the exercise of appellate, and not original, federal-question jurisdiction. As was made clear three years later in *Osborn* v. *Bank of the United States*, 9 Wheat. 738 (1824):

> "In those cases in which original jurisdiction is given to the supreme court, the judicial power of the United States cannot be exercised in its appellate form. In every other case the power is to be exercised in its origi-

---

[51] Marshall's statement is of course consistent with the view that the Eleventh Amendment bars federal-question jurisdiction over suits that are prosecuted against States by noncitizens or aliens, but does not bar federal jurisdiction over suits by citizens of the State being sued. But it is flatly inconsistent with the Court's current position that the Amendment, despite its language and history, should be interpreted as constitutionalizing a broad sovereign immunity principle. Like the discussion earlier in *Cohens*, it evinces the Marshall Court's understanding that the Eleventh Amendment was to be construed narrowly to accomplish the purpose for which it was adopted. It is worth noting that, when the troublesome case hypothesized in *Cohens*—in which a writ of error was taken by a *noncitizen* of a State—arose 10 years later, the Marshall Court reached the merits of the claim without even discussing any possible Eleventh Amendment bar. See *Worcester* v. *Georgia*, 6 Pet. 515 (1832). Although the Court in *Worcester* did not discuss the Eleventh Amendment issue, the issue was raised by the plaintiff in error. See *id.*, at 533–534.

nal or appellate form, or both, as the wisdom of congress may direct. With the exception of these cases in which original jurisdiction is given to this court, there is none to which the judicial power extends, from which the original jurisdiction of the inferior courts is excluded by the constitution. Original jurisdiction, so far as the constitution gives a rule, is co-extensive with the judicial power. We find in the constitution no prohibition to its exercise, in every case in which the judicial power can be exercised." *Id.*, at 820–821.

The Court continued, speaking of federal-question jurisdiction: "It would be a very bold construction to say that [the judicial] power could be applied in its appellate form only, to the most important class of cases to which it is applicable." *Ibid.*

*Osborn* itself involved several important Eleventh Amendment issues. The State of Ohio had seized bank notes and specie of the Bank of the United States pursuant to a statute imposing a tax on the Bank. The statute was evidently unconstitutional under the Court's holding in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). The Bank, which was treated as a private corporation and not a division of the Federal Government for purposes of the suit, obtained an injunction in federal court prohibiting the State from enforcing the tax and requiring the return of the seized funds. The State of Ohio appealed to the Supreme Court, relying in part on the Eleventh Amendment as a bar to the proceedings.

Chief Justice Marshall's opinion for the Court carefully explains that the sovereign immunity principles of the Eleventh Amendment have no application where the State is not a party of record:

"It may, we think, be laid down as a rule which admits of no exception, that, in all cases where jurisdiction depends on the party, it is the party named in the record. Consequently, the 11th amendment, which restrains

the jurisdiction granted by the constitution over suits against States, is, of necessity, limited to those suits in which a State is a party on the record." 9 Wheat., at 857.

Technically, this principle does not address the question whether a suit may be brought against a State, but rather the question whether a suit is indeed to be understood as a suit against a State.[52] Nonetheless, it represents a narrow, technical construction of the Eleventh Amendment, and is thus of a piece with the immediately following language:

"The amendment has its full effect, if the constitution be construed as it would have been construed, had the jurisdiction of the court never been extended to suits brought against a State, by the citizens of another State, or by aliens." *Id.*, at 857–858.

The restatement of the principle of *Cohens* demonstrates Marshall's understanding that neither Article III nor the Eleventh Amendment limits the ability of the federal courts to hear the full range of cases arising under federal law.

The lack of original federal-question jurisdiction, combined with the paucity of admiralty actions against the States, deprived the Marshall Court of the opportunity to rule often on the effect of the Eleventh Amendment on state sovereign immunity in federal court. Moreover, the Court's rulings demonstrate a certain reluctance squarely to decide the extent to which the States were suable in federal court. This was perhaps a result of the Court's sensitivity to the unpopular decision in *Chisholm* v. *Georgia*, the lack of effective governmental power to enforce its decisions, and the centripetal forces that were driving the Nation toward civil war. None-

---

[52] This conclusion is in some tension with the Court's holding in *Governor of Georgia* v. *Madrazo*, 1 Pet. 110 (1828), discussed *supra*, at 292–293. But see 1 Pet., at 122–123. It has been suggested that the distinction between the cases is that there was no cause of action available under federal or admiralty law against the Governor personally in *Madrazo*, while the contrary was the case here. See Fletcher, at 1086–1087.

theless, a careful reading of the Marshall Court's precedents indicates that the Marshall Court consistently adopted narrow and technical readings of the Amendment's import and thus carefully retained the full measure of federal-question and admiralty jurisdiction.

## IV

The Marshall Court's precedents, and the original understanding of the Eleventh Amendment, survived until near the end of the 19th century. In 1875, Congress gave the federal courts general original federal-question jurisdiction. 18 Stat. 470. For the first time, suits could now be brought against States in federal court based on the existence of a federal cause of action. In *Hans* v. *Louisiana*, 134 U. S. 1 (1890), a citizen of Louisiana sued his State for payment on some bonds that the state government had repudiated. The plaintiff claimed a violation of the Contracts Clause. The Court held in favor of the State and ordered the suit dismissed.

*Hans* has been taken to stand for the proposition that the Eleventh Amendment, despite its terms, bars the federal courts from hearing federal-question suits by citizens against their own State.[53] As I have argued before, the Court's ambiguous opinion need not be interpreted in this way. See *Employees* v. *Missouri Dept. of Public Health and Welfare*, 411 U. S., at 313–315 (BRENNAN, J., dissenting). The *Hans* Court relied on Justice Iredell's dissent in *Chisholm*, which as noted above, *supra*, at 283, rested on the absence of a statutory cause of action for Mr. Chisholm against the State of Georgia and reserved the question of the constitutional status of state sovereign immunity. See *Hans*, 134 U. S., at 18–19. The Court further noted the "presumption that

---

[53] For example, the Court today states that in *Hans*, "the Court held that the [Eleventh] Amendment barred a citizen from bringing a suit against his own State in federal court, even though the express terms of the Amendment do not so provide." *Ante*, at 238.

no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution—anomalous and unheard of when the Constitution was adopted." *Id.*, at 18. The opinion can thus sensibly be read to have dismissed the suit before it on the ground that no federal cause of action supported the plaintiff's suit and that state-law causes of action would of course be subject to the ancient common-law doctrine of sovereign immunity.

Whether the Court's departure from a sound interpretation of the Eleventh Amendment occurred in *Hans* or only in later cases that misread *Hans*, however, is relatively unimportant. If *Hans* is a constitutional holding, it rests by its own terms on two premises.

First, the opinion cites the comments by Madison, Marshall, and Hamilton in the ratification debates. *Id.*, at 12–14. The Court concludes that permitting suits against States would be "startling and unexpected," *id.*, at 11, and would "strain the Constitution and the law to a construction never imagined or dreamed of." *Id.*, at 15. The historical record outlined above demonstrates that the Court's history was plainly mistaken. Numerous individuals at the time of the Constitution's ratification believed that it would have exactly the effect the *Hans* Court found unimaginable. Moreover, even the comments of Madison, Marshall, and Hamilton need not be taken to advocate a constitutional doctrine of state sovereign immunity. Read literally and in context, all three were explicitly addressed to the particular problem of the state-citizen diversity clause. All three were vitally concerned with the constitutionally unauthorized displacement of the state law of creditors' rights and remedies that would be worked by an incorrect reading of the state-citizen diversity clause. All three are fully consistent with a recognition that the Constitution neither abrogated nor instituted state sovereign immunity, but rather left the ancient doctrine as it found it: a state-law defense available in state-law causes of action prosecuted in federal court.

Second, the opinion relies heavily on the supposedly "anomalous" result that, if the Eleventh Amendment were read literally,

> "in cases arising under the Constitution or laws of the United States, a State may be sued in the federal courts by its own citizens, though it cannot be sued for a like cause of action by the citizens of other States, or of a foreign state." *Id.*, at 10.

Even if such an "anomaly" existed, it would not justify judicial rewriting of the Eleventh Amendment and Article III and the wholesale disregard of precedents. But in any event a close look at the historical record reveals that the "anomaly" can easily be avoided without a general expansion of a constitutionalized sovereign immunity doctrine. The Eleventh Amendment can and should be interpreted in accordance with its original purpose to reestablish the ancient doctrine of sovereign immunity in state-law causes of action based on the state-citizen and state-alien diversity clauses; in such a state-law action, the identity of the parties is not alone sufficient to permit federal jurisdiction. If federal jurisdiction is based on the existence of a federal question or some other clause of Article III, however, the Eleventh Amendment has no relevance. There is thus no Article III limitation on otherwise proper suits against States by citizens, noncitizens, or aliens, and no "anomaly" that requires such drastic "correction."

The Court has repeatedly relied on *Hans* as establishing a broad principle of state immunity from suit in federal court.[54] The historical record demonstrates that, if *Hans* was a con-

---

[54] In *Ex parte New York*, 256 U. S. 490 (1921), the Court even extended *Hans* (or its view of *Hans*) to admiralty jurisdiction, thus overruling Justice Washington's 110-year-old holding that the Eleventh Amendment did not apply to admiralty actions. See *United States* v. *Bright*, 24 F. Cas. 1232 (No. 14,647) (CC Pa. 1809), discussed *supra*, at 292.

stitutional holding, it rested on misconceived history and misguided logic.[55]

The doctrine that has thus been created is pernicious. In an era when sovereign immunity has been generally recognized by courts and legislatures as an anachronistic and unnecessary remnant of a feudal legal system, see, *e. g.*, *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47, 57 (1944) (Frankfurter, J., dissenting); *Muskopf* v. *Corning Hospital Dist.*, 55 Cal. 2d 211, 359 P. 2d 457 (1961); W. Prosser, The Law of Torts 984–987 (4th ed. 1971), the Court has aggressively expanded its scope. If this doctrine were required to enhance the liberty of our people in accordance with the Constitution's protections, I could accept it. If the doctrine were required by the structure of the federal system created by the Framers, I could accept it. Yet the current doctrine intrudes on the ideal of liberty under law by protecting the States from the consequences of their illegal conduct. And the decision obstructs the sound operation of our federal system by limiting the ability of Congress to take steps it deems necessary and proper to achieve national goals within its constitutional authority.

I respectfully dissent.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

I, too, dissent and join JUSTICE BRENNAN's opinion. Its exhaustive historical review and analysis demonstrate the Eleventh Amendment error in which the Court today persists. As JUSTICE BRENNAN shows, if *Hans* v. *Louisiana*, 134 U. S. 1 (1890), is a constitutional holding, it then reads into the Amendment words that are not there and that can-

---

[55] If *Hans* was not a constitutional holding, however, its use of the Madison, Marshall, and Hamilton comments would be substantially more justifiable; the relevance of this material was simply to show that the common law did not recognize a cause of action on a debt against a sovereign. Since Congress had not created any such action, the Court justifiably refused to do so itself.

not be reconciled with any principled view of congressional power; JUSTICE BRENNAN is surely correct when he says, *ante*, at 302, that the case rests on "misconceived history and misguided logic." Thus, the Court today compounds a longstanding constitutional mistake. The shield against just legal obligations afforded the States by the Court's prevailing construction of the Eleventh Amendment as an "exemplification" of the rule of sovereign immunity, *ante*, at 239, n. 2, quoting *Ex parte New York*, 256 U. S. 490, 497 (1921), simply cannot be reconciled with the federal system envisioned by our Basic Document and its Amendments.

Indeed, though of more mature vintage, the Court's Eleventh Amendment cases spring from the same soil as the Tenth Amendment jurisprudence recently abandoned in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985). Both in its modern reading of *Hans*, *supra*, and in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), the Court, in derogation of otherwise unquestioned congressional power, gave broad scope to circumscribed language by reference to principles of federalism said to inform that language.* The intuition underlying *Hans* and its contemporary progeny is no truer to the federal structure or to a proper view of congressional power than was that underlying *National League of Cities*.

But I would dissent from the Court's spare opinion and predictable result on other grounds as well. There is no

---

*See *Fry* v. *United States*, 421 U. S. 542, 557 (1975) (dissenting opinion) ("As it was not the Eleventh Amendment by its terms which justified the result in *Hans*, it is not the Tenth Amendment by its terms that prohibits congressional action which sets a mandatory ceiling on the wages of all state employees. Both Amendments are simply examples of the understanding of those who drafted and ratified the Constitution that the States were sovereign in many respects, and that although their legislative authority could be superseded by Congress in many areas where Congress was competent to act, Congress was nonetheless not free to deal with a State as if it were just another individual or business enterprise subject to regulation").

need to expatiate on them here, where so much already has been written. It suffices to say that I adhere to the views expressed in the dissenting opinion in *Edelman* v. *Jordan*, 415 U. S. 651, 688 (1974). See also *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 151 (1981) (dissenting statement). Thus, I would affirm the judgment here on the ground that California, as a willing recipient of federal funds under the Rehabilitation Act, consented to suit when it accepted such assistance. And a fair reading of the statute and its legislative history indicates for me that Congress produced the Act in exercise of its power under § 5 of the Fourteenth Amendment and thereby abrogated any claim of immunity the State otherwise might raise.

JUSTICE STEVENS, dissenting.

Because my decision to join JUSTICE BRENNAN's dissent is a departure from the opinion I expressed in *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 151 (1981), a word of explanation is in order. As I then explained, notwithstanding my belief that *Edelman* v. *Jordan*, 415 U. S. 651 (1974), was incorrectly decided, see 450 U. S., at 151, n. 2, I then concluded that the doctrine of *stare decisis* required that *Edelman* be followed. Since then, however, the Court has not felt constrained by *stare decisis* in its expansion of the protective mantle of sovereign immunity — having repudiated at least 28 cases in its decision in *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 165–166, n. 50 (1984) (STEVENS, J., dissenting) — and additional study has made it abundantly clear that not only *Edelman*, but *Hans* v. *Louisiana*, 134 U. S. 1 (1890), as well, can properly be characterized as "egregiously incorrect." 450 U. S., at 153. I am now persuaded that a fresh examination of the Court's Eleventh Amendment jurisprudence will produce benefits that far outweigh "the consequences of further unraveling the doctrine of *stare decisis*" in this area of the law. *Id.*, at 155.